**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JANE DOE 1, JANE DOE 2, JANE DOE 3,
JANE DOE 4, and JANE DOE 5

  Plaintiffs

     v.

GEORGE WASHINGTON UNIVERSITY
and KYLE RENNER

    Defendants.

Case No. 1:18-cv-01391 (RBW)

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

     Plaintiffs Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, and Jane Doe 5 allege for their First Amended Complaint herein:

**PRELIMINARY STATEMENT**

     1.      Imagine a workplace in America where a man could sexually assault three female coworkers, sexually harass and stalk eight other employees, and not only admit to this misconduct, but announce a public sexual rating system of the female employees he assaulted. Too far-fetched? Well, that has been the workplace environment at the Institute for International Economic Policy ("IIEP") at George Washington University ("GW") over the past year. Remarkably, GW knows all of this, as at least three student-employees have been raped, and eight others sexually harassed, stalked and tormented by Emerson Jones, a sexual predator.

     2.      The IIEP workplace became a nightmare, prison-like environment for the female employees working with Jones. The women raped by Jones were forced to continue to work with him while he bragged to the other women about his non-consensual sexual encounters at

the IIEP workplace. He went so far as to publicly declare a sexual rating system for the women attacked and tormented by this psychopath.

3.      The women have complained, but GW has taken no action to protect them. Instead, GW is providing safe harbor and refuge for Jones, hiding behind the argument that GW was/is protecting the due process rights of Jones, and engaging in outright victim blaming of its own student employees.

4.      GW has actual knowledge of Jones' crimes and sexual misconduct, yet it has taken no action to protect the female staff members. Even worse than GW's attempt to conceal the misconduct occurring on its campus workplace, GW retaliated against the Plaintiffs for complaining of the sexually hostile workplace and attempted to silence them. In response to the hostile work environment, GW told the Plaintiffs not to come to work. Meanwhile, GW has yet to terminate Jones. He continues to prey on the young female students at GW, while the University has turned a blind eye to the hostile, dangerous work environment at IIEP.

5.      The extreme distress, humiliation, embarrassment and feeling of powerlessness the Plaintiffs have experienced in the face of such an injustice is not something that heals well with time. This is especially true because the women victimized by Emerson were also students of GW, a place where they should feel protected and safe. In reality, however, GW has placed the purported "rights" of the sexual predator over the safety, security, and rights of his victims.

6.      A university should be a place that fosters intellectual development, personal growth, builds confidence, and provides a student with the skills to confront the challenges of the world. GW has been no such place for Plaintiffs. Instead, Plaintiffs, all of whom are on financial aid and participating in a federal work study program through GW, have been

Klaproth Law
406 5ᵀᴴ Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

subjected to a dangerous and sexually hostile workplace at GW. The parents of these eleven victims entrusted the care and education of their daughters to GW. GW betrayed that trust.

7.      GW, undoubtedly a premier national university, applauds itself on its website: "GW responds to the growing needs of our own community and society at large through our commitment to finding solutions to national and global problems." The problem GW needs to solve here is not global, it is in its own backyard; it involves its employees, sexual violence, stalking, and a hostile work environment, and violations of federal law. It is legally and morally indefensible.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §1331 and 28 U.S.C. 1367.

9.      This Court has personal jurisdiction over the Defendants pursuant to D.C. Code § 13-423(a)(1)-(4).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as the acts and/or omissions alleged in this Amended Complaint occurred in the District of Columbia. Moreover, the Defendants are found in, reside, or transact business in the District of Columbia. Venue is also proper as Plaintiffs' claims involve one or more common questions of fact that arise from Defendants' conduct occurring in the Washington, D.C. metropolitan area.

## PARTIES AND RELEVANT PERSONS

11.     Plaintiff Jane Doe 1 is an individual residing in the District of Columbia. Jane Doe 1 is an employee as defined by D.C. Code § 2–1401.02(9).

12.     Plaintiff Jane Doe 2 is an individual residing in the District of Columbia. Ms. Jane Doe 2 is an employee as defined by D.C. Code § 2–1401.02(9).

13. Plaintiff Jane Doe 3 is an individual residing in the District of Columbia. Jane Doe 3 is an employee as defined by D.C. Code § 2–1401.02(9).

14. Plaintiff Jane Doe 4 is an individual residing in the District of Columbia. Jane Doe 4 is an employee as defined by D.C. Code § 2–1401.02(9).

15. Plaintiff Jane Doe 5 is an individual residing in the District of Columbia. Ms. Jane Doe 5 is an employee as defined by D.C. Code § 2–1401.02(9).

16. Defendant George Washington University is an educational institution with its principal place of business located in the District of Columbia. Defendant GW conducts substantial business activities in the District of Columbia. Defendant GW is an employer defined by D.C. Code § 2–1401.02(10). GW is an educational institution that receives Federal financial assistance within the scope of 20 U.S.C. § 1681(a) ("Title IX"). At all times relevant, Defendant GW acted by and through its agents, servants, and/or employees within the course and scope of their employment with GW and in furtherance of GW's business.

17. IIEP is an institute located within the Elliott School of International Affair, which is part of the George Washington University.

18. Defendant Kyle Renner is an individual employed by GW in the District of Columbia. At all times relevant herein, Defendant Renner was the General Operations Manager and the supervisor for Plaintiffs. At all times relevant herein, Defendant Renner was acting within the scope of his employment in a supervisory position with GW.

19. Emerson Jones is an individual employed by GW in the District of Columbia. At all times relevant, Jones was in a supervisory role at the IIEP. Jones is approximately 24 years old—much older than the younger female Plaintiffs he preyed upon.

20. Defendants in this matter are jointly and severally liable to Plaintiffs for the

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

harms and losses sustained by Plaintiffs.

**FACTS COMMON TO ALL COUNTS**

21.      At all times relevant, each Plaintiff worked for GW within the IIEP as part of the

Federal Work Study Program. As a participating institution in the Federal Work Study Program,

GW applied for funding from the U.S. Department of Education to employ students, such as the

Plaintiffs, at the University in part-time employment. In order to obtain a Federal Work Study

job at GW, the Plaintiffs were required to complete the standard employment forms, including

USCIS Form I-9 and IRS Form W-4. GW paid the Plaintiffs their wages via direct deposit for

the work they performed for GW. GW withheld state and federal taxes from the paychecks it

issued to Plaintiffs.

22.      At all times relevant, the IIEP workplace consisted of an open-floor plan with

numerous workstations. The staff sat in close proximity to one another in open workstations.

23.      Plaintiffs were excellent employees that excelled in their positions at the IIEP.

**The Hostile Work Environment for Jane Doe 2**

24.      Jane Doe 2 is currently a Sophomore at GW. Jane Doe 2 began working for GW

at the IIEP in January 2017. She was hired as the Digital Communication and Social Media

Assistant.

25.      Jones began his predation of Jane Doe 2 within months of her working at IIEP.

She was only a Freshman at GW at the time.

26.      In May 2017, Jones asked Jane Doe 2 to come over to his apartment. Jane Doe 2

agreed but explicitly told Jones numerous times that she did not want to do anything sexual with

him. Once there, Jones ignored Jane Doe 2's objections and sexually assaulted her. Jane Doe 2

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

tried to push Jones off of her, but he was much larger and stronger than her. She told him to stop multiple times, but Jones would not. Jones raped Jane Doe 2.

27.     Unable to deal with the trauma that she just endured, she returned home to Utah for the summer and tried to recover from the assault.

28.     That entire summer, Jane Doe 2 was tormented by the rape and her return to GW. She dreaded returning to work at IIEP in the fall, but she needed the money and the position with IIEP was highly coveted by students looking to build their resumes. She feared reporting the rape because she was worried that Jones would retaliate. And, what if people did not believe her? She felt trapped and alone.

29.     When Jane Doe 2 returned to work at IIEP in the fall of 2017, she was distraught to learn that Jones was still working at IIEP. She told herself that she could get through this if she avoided Jones and was never left alone with him.

30.     She feared going to work every day since she was required to work in close proximity to the man that had sexually assaulted her. Because of her fear of Jones, Jane Doe 2 asked her friend and supervisor, Jane Doe 3, to walk her to work on several occasions.

31.     Jones continued to torment Jane Doe 2 and the other women employees throughout the fall of 2017. In one instance, Jones told Jane Doe 2, "I am never sticking my dick into the pool of IIEP ever again."

32.     Jones also began his sexual rating system of the women he raped. Jones publicly announced to the IIEP staff members his sexual rating of the female coworkers from best to worse. He described one of the women he raped as "a dead fish because she was so drunk."

33.     On another occasion, Jones told Jane Doe 2's faculty supervisors and her coworkers that "yeah, we fucked" (referring to him and Jane Doe 2); a coworker informed Jane Doe 2 that Jones had been "degrading" Jane Doe 2.

34.     Jones would frequently brag in the workplace about his sexual exploitation of the women in the workplace. He bragged about the number of partners (e.g. victims) he had. And he would publicly torment and degrade his victims. These women were not only sexually assaulted by this monster, they were mentally assaulted by his taunts, threats, and ridicule.

35.     On March 26, 2018, Jane Doe 2 was constructively discharged by GW.

36.     As a direct and proximate result of the sexual assault and harassing conduct in the IIEP workplace, Jane Doe 2 has suffered from severe depression, anxiety, insomnia, nightmares, and panic attacks.  Jane Doe is in a constant state of fear while on GW's campus, and in the IIEP workplace that she will encounter Jones.  Jane Doe 2's panic attacks have been so severe that she missed many of her classes.  During her final exam period, Jane Doe 2 was unable to study due to her inability to sleep and severe emotional distress. As a result of sexual assault and hostile work environment, Jane Doe 2's grades have suffered significantly.

**The Hostile Work Environment for Jane Doe 4**

37.     Jane Doe 4 is currently a sophomore at GW. She began working for GW at the IIEP in October 2016. She was hired as a Team Member on the Events and Operations Team.

38.     As a Team Member on the Events and Operations Team, Jane Doe 4 was responsible for planning IIEP events and ensuring that the events ran smoothly.

39.     Jane Doe 4, like the other Plaintiffs, was forced to work closely with Jones thereby subjecting her to a sexually hostile workplace. Initially, Jones' harassment consisted of

demeaning tactics such as intentionally calling the female employees by the wrong names to diminish and insult them. But it grew worse as time went on.

40.     On one occasion, Jane Doe 4 heard Jones say to numerous coworkers that he "would never dip his dick in the IIEP pool again."

41.     On another occasion, a female coworker finally stood up to Jones on behalf of the women in the office to address his misogynistic conduct. Jones shouted down the female coworker by stating, "you will have to get used to things like that if you ever want to be successful in a work environment." In fact, this was Jones' constant refrain anytime a female worker confronted his sexist behavior. The female coworker left the office crying.

42.     Jones referred to new female staff members as his "new office crush." To Jones, the younger female staff members were nothing but conquests, which he made clear in the workplace. Unfortunately, Jane Doe 4 is one of the female workers in the IIEP that Jones targeted.

43.     On September 30, 2017, Jane Doe 4 was out at a nightclub with her IIEP coworkers. At that nightclub, Jones bought the underage IIEP staff, including Jane Doe 4, an excessive number of alcoholic drinks. Eventually, Jones got Jane Doe 4 exceedingly intoxicated at the club. After taking the IIEP workers back to GW's campus drunk, Jones asked Jane Doe 4 to come his apartment. Jane Doe 4 did not want to go, but Jones was older than her and her boss at IIEP, so she felt she had no choice. At Jones' apartment, Jane Doe 4 slipped in and out of consciousness, as she was still grossly intoxicated. While in that inebriated and unresponsive state, Jones took off her clothes, climbed on top of her and raped Jane Doe 4. Jane Doe 4 said "no" and tried to fight him off, but she did not have the strength. She continued to fight him and

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

was able to stop the assault before falling asleep. The next morning she awoke to Jones, again, attempting to rape her. She pushed Jones off of her and fled.

44.     For Jane Doe 4, Jones' assault did not end on that terrible, tragic night. After raping Jane Doe 4, Jones bragged in the workplace about his encounter to Jane Doe 4's coworkers. He made humiliating, derogatory sexual comments about Jane Doe 4 to her coworkers and the faculty members working in the IIEP. And adding insult to injury, Jones publicly ranked Jane Doe 4 among the other females in the office that he had victimized.

45.     As a direct and proximate result of the sexual assault and harassing conduct in the IIEP workplace, Jane Doe 4 has suffered from severe depression, anxiety, and panic attacks. Jane Doe 4 tries to avoid interactions with men at GW and in the IIEP workplace. Jane Doe 4 has suffered utter humiliation in the IIEP workplace as Jones publicly announced to Jane Doe 4's coworkers, supervisors, and professors about his encounter with Jane Doe 4. This has diminished Jane Doe 4's self-esteem and her faculty advisers' view of her in the IIEP workplace.

**The Hostile Work Environment for Jane Doe 1**

46.     Jane Doe 1 is currently a Junior at GW. She began working for GW at the IIEP in September 2017. She was hired as the Events and Operations Assistant.

47.     As the Events and Operations Assistant, Jane Doe 1 was responsible for organizing travel arrangements for event attendees, staffing events, preparing rooms and meeting spaces, creating event menus and ordering catering, and booking event spaces for IIEP events.

48.     Shortly after beginning her employment at IIEP, Jane Doe 1's supervisor, Emerson Jones, began making inappropriate sexual advances towards her. It started on October 1, 2017, when Jones texted Jane Doe 1 at 2:18 a.m. "oh my god you're so hot."

49.     On October 6, 2017, Jones invited Jane Doe 1 over to his house. She declined and said that she would like to maintain a professional relationship. Nonetheless, Jones persisted and said "maybe we could go out another time."

50.     On October 26, 2017, Jane Doe 1 learned that Jones had threatened to kill her female coworker. This made her fearful of Jones, as he was persistent in his pursuit of her. She worried that he would harm her if she turned him down or made him angry.

51.     On November 9, 2017, Jane Doe 1 received a text message from a female coworker asking if Jones had left the office. Jones had followed the coworker into an elevator, trying to corner her. She ran from him, fearing that he would sexually assault her. She hid in a stairwell, until Jones left the office. Jane Doe 1 feared that Jones would try the same thing on her. Jones had created a work environment where the female employees had to run and hide, so they would not be left alone with him, and text the other female employees to find out if it was safe.

52.     On December 7, 2017, Jane Doe 1 told Jones while in the office that she was stressed about her upcoming performance. Jones asked if he could attend the performance. Jane Doe 1 told him no.

53.     On December 9, 2017, Jane Doe 1 received a text message from Jones containing a picture of her during her performance. Apparently, Jones had attended the performance over Jane Doe 1's protestations that he not. Jane Doe 1 became fearful that Jones was going to begin pursuing her again.

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

54.     On December 10, 2017, Jones again asked Jane Doe 1 on a date; she said no.

55.     Feeling unsafe about Jones' persistent pursuit, Jane Doe 1 confided in a coworker about Jones' aggressive behavior. Jane Doe 1 learned from the coworker that Jones has raped one of their coworkers. Jane Doe 1 had been fearful of Jones and his behavior, but now she knew that he was capable of sexual assault.

56.     On December 18, 2017, Jane Doe 1 wrote to her supervisor, Kyle Renner, "I need to sit down with you about an urgent issue regarding our workplace dynamic…."

57.     Renner was the supervisor for all Plaintiffs. He was the person authorized to receive complaint regarding workplace misconduct and institute corrective measures. In the office, he was the sole representative and agent of GW. He was the person that GW tasked with authority to oversee and manage Jones and the other employees.

58.     On December 19, 2017, Jane Doe 1 filed a complaint with Renner. During this meeting, Jane Doe 1 told Renner that she felt unsafe working with Jones. She described Jones' behavior toward her, and also stated that one of her female coworkers had been raped. ***Renner responded, "sometimes you need to work with people that you don't necessarily get along with."*** Renner largely ignored the complaint, leaving Jones in the workplace and Jane Doe 1 feeling vulnerable and helpless.

59.     Any properly trained manager (or any moral human being for that matter) would have heard Jane Doe 1's complaint and did everything in his or her power to protect the women working under and around Jones. Renner did nothing. Renner was part of the problem and his behavior is indicative of the systematic failures of GW to recognize and respond to complaints of sexual harassment in the workplace.

Klaproth Law
406 5ᵀᴴ Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

60.     More egregious, Renner actually tried to cover up Jones' misconduct. Jones and Renner were close friends that were known to go drinking together after work. Rather than report Jones to the police or to the University, Renner brushed aside the complaints made by Plaintiffs and others.

61.     Renner also had no incentive to turn Jones in because Renner was also involved in his own workplace misconduct. On multiple occasions, Renner would touch the small of Jane Doe 1's back while in the workplace, without her permission. The touch was sexual and inappropriate in the workplace. Renner would have never touched a male employee in such way.

62.      It was also generally known throughout the workplace that Renner had a sexual relationship with one of the female employees. Renner also made repeated derogatory comments about women in the workplace, such as disparaging "women's studies." All of this led Jane Doe 1 to conclude that Renner would not take her complaints seriously, as he made repeated misogynistic comments, was rumored to have had an inappropriate sexual relationship in the office, acted blasé towards Jane Doe 1's complaint to him, and was friends and drinking buddies with Jones. Indeed, she feared that Renner may retaliate against her for complaining about this buddy. Jane Doe 1 felt scared, intimidated, and alone.

63.     On December 21, 2017, Jane Doe 1 received an email from a Title IX investigator. But the Title IX investigator took no action beyond that email and failed to conduct any independent investigation beyond reaching out to the complainant. This was a direct violation of GW's obligation to perform independent investigations of sexual assault and misconduct regarding students. GW's excuse that the victims did not drive its investigation is nonsense. GW takes federal money and in exchange is required to abide by the dictates of Title

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

IX; it cannot wash its hands of this obligation and let a complaint die on the vine without any investigation.

64.     On January 30, 2018, Jones openly discussed his sexual exploits in the workplace. Jane Doe 1 was present and heard Jones demean the women he "slept with." Jane Doe 1 felt like Jones' announcement was designed intimidate and to show his control over the women he worked with – that he could do or say anything with no repercussions.

65.     Upon information and belief, Jones knew of Jane Doe 1's complaint to Renner (and Jones must have been contacted by a Title IX investigator at this point), thus the message from Jones was clear – the women could complain all they wanted, but Jones behavior would not change. Jane Doe 1 felt trapped and depressed.

66.     Following initial complaint to Renner, Jones deliberately and intentionally increased his hostility towards her, which altered the terms and conditions of her employment. For instance, on February 1, 2018, Jane Doe 1 observed Jones in Renner's office discussing something with Renner. Just before the meeting, Jones had been treating Jane Doe 1 with hostility and harassed her as she quietly did her work. Jones also disparaged Jane Doe 1 to her supervisor. As a result, Jane Doe 1's supervisor told her that she was not allowed to work the event that evening even though the event was understaffed. This was all in retaliation for Jane Doe 1's complaint to Renner.

67.     On February 7, 2018, Jane Doe 1 requested that she be demoted to Event staff so that she would not have to interact with Jones anymore.

68.     Jane Doe 1 was also given the option of working from home – which was GW's solution to a sexually hostile work environment – penalize Jane Doe 1 and remove her from the workplace, not Jones.

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

69.     On April 2, 2018, Jane Doe 1 was constructively discharged. She was forced to resign out of her fear of interacting with Jones in the IIEP office.

70.     As a direct and proximate result of the hostile work environment and harassing conduct in the IIEP workplace, Jane Doe 1 has suffered from an exacerbation of her post-traumatic stress disorder, anxiety, social isolation, disrupted sleep, panic attacks, an inability to concentrate and study, diminished self-esteem, symptoms of depression, and difficulty completing her course work. In addition, Jane Doe 1's emotional distress and psychosomatic responses to stress have impeded her ability to pursue her course work in her major, which requires her to perform in front of audiences. The emotional distress caused by the hostile work environment and harassment has resulted in Jane Doe 1 dropping out of her graduate school prep course and forced her to reschedule a graduate school exam. Jane Doe 1 is fearful while on GW's campus and in the IIEP workplace that she will encounter Jones and/or that Jones will physically assault her.  Due to her emotional distress, Jane Doe 1 has missed classes due to anxiety and skipped classes for fear she may encounter Jones. Jane Doe 1's emotional distress has adversely impacted her eating and exercise habits, which has resulted in significant weight fluctuations.

**The Hostile Work Environment for Jane Doe 3**

71.     Jane Doe 3 is currently a Sophomore at GW. She began working for GW at the IIEP in September 2016. She is employed as the Digital Communications and Social Media Team Lead.

72.     As the Digital Communications and Social Media Team Lead, Jane Doe 3 is responsible for managing and supervising the Digital Communications Social Media Team. Jane Doe 3 interacts with Renner as part of her job on a daily basis.

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

73.    As part of her job, Jane Doe 3 has had to endure sexually hostile conduct from Renner. When walking next to Jane Doe 3, Renner would touch Jane Doe 3's arm or shoulder. While working at her computer, Renner has frequently reached over Ms. Jane Doe 3 to type on her keyboard while she remains seated. Renner also routinely commented on Ms. Jane Doe 3's clothing in the office. Renner has never exhibited this behavior to the male employees.

74.    It is also common knowledge in the office that Renner had slept with a female student who had worked in the IIEP. Renner also asked another female student employee out for a coffee after she left the IIEP.

75.    In addition, Renner gave preferential treatment to Jane Doe 3's co-team leader, which has made it extremely difficult for her to perform her job in the IIEP workplace.  Renner would dismiss Jane Doe 3's recommendations in front of the staff, and instead request input from the male co-team leader. This diminished Jane Doe 3's reputation, role, and responsibilities in the IIEP workplace.  Although Jane Doe 3 had equal responsibilities and authority as her male co-team leader, Renner would treat Jane Doe 3 as the subordinate to her male co-team leader.  Jane Doe 3's male co-team leader even told Jane Doe 3 that Renner was a misogynist and that Renner treated Jane Doe 3 unfairly in the workplace.

76.    On February 17, 2017, during Jane Doe 3's professional development meeting, Renner asked Jane Doe 3 when she intended to get married and have kids. Jane Doe 3 later learned that he asked several female employees this question during their professional development meetings.

77.    In her position of Digital Communications and Social Media Team Lead, Jane Doe 3 learned that Jones assaulted three girls in the office. Numerous female workers in the IIEP requested that Jane Doe 3 and/or Renner schedule different shifts for them to avoid

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

interacting with Jones in the IIEP office. Female staff members complained to Jane Doe 3 about Jones' sexual misconduct and inappropriate conduct in the office. In one such complaint, a female employee complained that Jones had been asking underage female workers to "get drunk" with him after work. Moreover, Jane Doe 3 received two written complaints in a suggestion box about Jones' sexually hostile behavior.

78.     Jane Doe 3 also received complaints that Jones had been discussing his sexual encounter with Jane Doe 2 loudly in the IIEP office. One staff member stated that Jones' had bragged to the staff members that Jane Doe 2 had "cheated on her boyfriend" with him.

79.     Jones' sexual harassment and assault of the female staff members in the IIEP office has impacted Ms. Jane Doe 3's ability to perform her job. She has filed as least *four* formal complaints with her supervisors about Jones' sexual harassment and assaults. Renner and GW have largely ignored those complaints or taken no discernible action to remove Jones from the workplace, begin a timely Title IX investigation, and/or report Jones to the police. As a result, Ms. Jane Doe 3 has not been able to function as the team lead. Ms. Jane Doe 3 works within feet of her female coworkers that were raped by Jones and there is nothing she can do to protect them because GW has ignored her complaints. *GW has not, and will not, terminate Jones*.

80.     Jane Doe 3 knew that her coworkers are fearful to come to work and to interact with Jones. She attempted to rearrange the female staff members work schedules, so they did not have to interact with Jones, but there are only so many work shifts that she can shuffle. How can Jane Doe 3 ask her female coworker, whom she knows has suffered severe and significant trauma, come into work the next day where she will see their rapist?

Klaproth Law
406 5ᵀᴴ Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

81.     Jane Doe 3 has begun to fear for her safety since she has been an advocate for the other female workers. This has resulted in Jane Doe 3 avoiding the office as much as possible and cutting back significantly on her hours.

82.     As a direct and proximate result of the hostile work environment and harassing conduct in the IIEP workplace, Jane Doe 3 has suffered from anxiety, social isolation, diminished self-esteem, panic attacks, an inability to concentrate and study, and difficulty completing her course work. Due to Jones' and Renner's harassing conduct, Jane Doe 3 has felt absolutely powerless in the IIEP workplace.  Due to the hostile work environment, Jane Doe 3 would avoid the IIEP workplace as much as possible. This adversely impacted her work performance as she was unable to interact with her team directly or her faculty supervisors. The hostile work environment also prevented Jane Doe 3 from performing her job as Digital Communications and Social Media Team Lead.  Jane Doe 3 received numerous complaints in her role as a supervisor as to Jones' sexual assaults and harassing conduct. When Jane Doe 3 conveyed these complaints to her supervisor, Renner, no action was taken and her subordinates continued to be subjected to sexual harassment and hostility. Consequently, her subordinates had no choice but to stop coming to work at IIEP in order to avoid Jones. Moreover, because Jane Doe 3 had to protect her co-workers from Jones, she was forced to take their shifts at events and spend more time with Jones; a man she found anxiety-inducing.

**The Hostile Work Environment for Jane Doe 5**

83.     Jane Doe 5 is currently a sophomore at GW. She began working for GW at the IIEP in January 2017. She was hired as a Team Member on the Events and Operations Team.

84.     As a Team Member on the Events and Operations Team, Jane Doe 5 was responsible for planning IIEP events and ensuring that the events ran smoothly.

85.     Jones began working at the IIEP shortly after Jane Doe 5 started her employment at the IIEP. The IIEP workplace immediately transformed into a hostile environment. The female workers, including Jane Doe 5, felt extremely uncomfortable around Jones due to his aggressive behavior and misogynistic comments.

86.     In one instance, Jane Doe 5 observed Jones shout down a female coworker after the female coworker requested that Jones stop verbally harassing her in the workplace. Jones became extremely aggressive, belittled her, and told the female coworker that she needed to stop being "emotional" get "used to this type of behavior in a work environment."

87.     Jane Doe 5 has heard Jones talk to other coworkers in the workplace about women in a sexually demeaning way and has heard Jones brag about his sexual experiences.

88.     To the female employees, such as Jane Doe 5, Jones would intentionally call them the incorrect names claiming that all the women in the office are the same.

89.     Jones' predatory pursuit of Jane Doe 5 began almost immediately after Jones started at the IIEP.

90.     In April 2017, Jane Doe 5 attended a party in a GW dorm room that was hosted by her IIEP coworker. At the party, Jane Doe 5 consumed an excessive amount of tequila shots that left her grossly intoxicated. She had announced to the people at the party how drunk she was, but she felt comfortable since she was with her friends. But there lurking in the background of the freshman party, was the 24-year-old Jones. While at the party, Jones repeatedly asked Jane Doe 5 to leave with him to his house. Jane Doe 5 repeatedly said no. As the party ended, Jones called an Uber and pressured Jane Doe 5 to leave with him. During the Uber ride, Jones began his assault in the car. Once at Jones' house, Jane Doe 5 "blacked out" and lost consciousness. She then came in and out of consciousness as Jones aggressively raped

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

her. Jane Doe 5 told Jones to stop and that it hurt, but she was too intoxicated to physically stop the assault.

91.     IIEP staff members have complained about Jones to Renner since March 2017, but Renner ignored those complaints and silenced the female complainants.

92.     As a direct and proximate result of the hostile work environment and harassing conduct in the IIEP workplace, Jane Doe 5 has suffered from severe depression, anxiety, social isolation, disrupted sleep, panic attacks, an inability to concentrate and study, diminished self-esteem, difficulty completing her course work, sexual insecurity, and financial insecurity since she was unable to work in the IIEP office.  Jane Doe 5's professional development has been impacted because she did not feel safe going to the IIEP workplace.  As a result, her peers and supervisors have viewed her as an unreliable worker. In addition, since Jane Doe 5 complained to Renner about Jones' assault and harassing conduct, Renner has viewed Jane Doe 5 in a sexualized manner which impacted her ability to perform her job. As a result of the sexual assault and harassing conduct, Jane Doe 5's performance in school has suffered. She has fallen behind in her coursework and missed classes.  Furthermore, Jane Doe 5's has negatively impacted her performance in her internship and extra-curricular activities at GW.

**GW's Indifference to the Complaints of Rape and Harassment**

93.     GW acknowledges that:

> Sexual harassment is destructive of such a climate and will not be tolerated in the University community. Sexual harassment creates unacceptable stress for the entire workforce, adversely affects morale, demeans the harassed individual, and could expose the University and the harasser to significant liability.[1]

[1]     https://facultyaffairs.gwu.edu/important-personnel-policies-0 (last accessed on April 9, 2018).

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

As such, GW claims, "[t]he George Washington University does not unlawfully discriminate against any person on any basis prohibited by federal law, the District of Columbia Human Rights Act…all allegations of discrimination, harassment, or complaints of unequal treatment are taken seriously." Such a proclaimed policy is aspirational in form,[2] but devoid of any substance. In this case, not only has GW demonstrated a deliberate indifference to Plaintiffs' complaints of harassment, it has provided safe harbor for the assailant.

94.     GW has had actual and constructive knowledge of the sexually hostile work environment since September 2017 when the harassment began. Jones made the sexually explicit comments in a small, shared, common workspace in front of supervisor and faculty members. The lack of inaction by GW demonstrates that atmosphere of systemic tolerance of sexual hostility by managers and supervisors existed in the IIEP.

95.     Moreover, as early as December 19, 2017, Jane Doe 1 filed a complaint with her supervisor, Renner. During this meeting, Jane Doe 1 told Renner that she felt unsafe working with Jones and that Jones had raped one of her coworkers. Renner responded, "sometimes you need to work with people that you don't necessarily get along with." GW took no action in response to Jane Doe 1's complaint.

96.     GW did nothing.

97.     On February 2, 2018, Jane Doe 3 and Jane Doe 2 met with Renner. During this meeting, Jane Doe 2 told Renner, her supervisor, that Jones had raped her. Jane Doe 2 further

Klaproth Law
406 5ᵀᴴ Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

---

[2]     Remarkably, GW's *Student Employee Manual for Students that Work at GW* contains a dead hyperlink to the section on sexual harassment.  *See Student Employee Manual for Students that Work at GW* at 15 (available at https://careerservices.gwu.edu/sites/g/files/zaxdzs2271/f/SE%20Student%20Manual_Revised%20%20August%20%202017.pdf ) (the "Sexual Harassment" section hyperlinks to this inactive site https://www.gwu.edu/hr/handbook/3.html#3.3 ).

told Renner that Jones raped two other girls in the IIEP office. During this meeting, Jane Doe 2 also gave Renner a written statement that detailed Jones' sexually hostile conduct and misogynistic comments in the workplace. Renner stated that he would talk to the Title IX office to see what he should do. Renner also recommended that Jane Doe 2 work from home.

98.     GW still did nothing.

99.     On February 9, 2018, Jane Doe 1 met with the Assistant Director for Sexual Assault Prevention and Response Office for Diversity, Equity, and Community Engagement ("ODECE"). Jane Doe 1 complained about Jones' sexual harassment and sexual assault of Jane Doe 5. ODECE stated that it would inquire to the General Counsel's Office whether the complaint would be treated as "student-on-student harassment" or "staff-on-staff harassment."

100.     On February 11, 2018, Jane Doe 2 observed Jones in the office so she emailed Renner, "I was wondering if we could have a follow-up meeting. Let me know if you are free soon?"  Renner never responded.

101.     On February 23, 2018, Jane Doe 2 had her "professional development meeting" with Renner. While she waited for her meeting, she was forced to sit next to Jones in the cubicles. The meeting lasted approximately 45 minutes to one hour, which consisted mostly of work-related matters. At the end of the meeting, Renner told Jane Doe 2 that to "follow-up" on her complaint about Jones, there was nothing Renner could do because his "hands were tied." Jane Doe 2 asked Renner to fire Jones. Renner repeatedly stated that his "hands were tied." Renner stated that Jane Doe 2 had to file an "official complaint with the Title IX office." Jane Doe 2 complained that this was unacceptable, because Jones was still had access to the girls in the office and that he could hurt them next. Jane Doe 2 complained that it was unacceptable that not only she had to work beside the man that raped her, but that GW would even allow a known

Klaproth Law
406 5ᵀᴴ Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

rapist into the office. Renner concluded the meeting by stating that Jane Doe 2 should work from home and go to therapy. At this time, Jane Doe 2 had also complained to the Title IX about Jones' harassment and assault.

102.    GW still did nothing.

103.    On February 28, 2018, Jane Doe 3 met with Renner. She told Renner during this meeting that she believed Jane 2 would be quitting IIEP because Kyle would not take action in response to her complaint. Renner again claimed that his "hands were tied" and it was "a difficult situation."

104.    GW took no action.

105.    On March 6, 2018, Jane Doe 1 learned that her previous complaint to ODECE would be treated as a "student-on-student harassment" rather than "staff-on-staff harassment" even though the harassment was occurring in the IIEP workplace.

106.    On March 7, 2018, Jane Doe 2 wrote to Renner that four female employees "and I want to discuss how we feel unsafe in the office. As far as I am aware, other females in the office are also going to be sending me statements that they want to be read as they couldn't make it to the meeting."

107.    On March 9, 2018, Plaintiffs met with Renner. During this meeting, each of the Plaintiffs detailed the sexual harassment they were exposed to in the workplace, Jones' sexual assaults on female staff members, Jones' demeaning treatment of the female staff members, and Jones' threat to kill a female staff member. The Plaintiffs also read written statements prepared by two other girls. The Plaintiffs told Renner that at least 11 female staff members had been impacted by Jones' hostile conduct. The Plaintiffs told Renner that they felt unsafe working with Jones. The Plaintiffs demanded an answer as to why GW had done nothing in response to

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

their complaints. Renner stated that he needed to utilize the "correct mechanisms" to terminate

Jones. The Plaintiffs pressed Renner what those "mechanisms" were. He had no answer. Renner

further stated that he did not want to ask Jones to work from home. He instead asked the

Plaintiffs to work from home.

108.    Still, GW did nothing.

109.    On March 26, 2018, Jane Doe 2 resigned from IIEP. She wrote to Renner:

> [W]orking in the recent months at IIEP has been a terrible experience for me. So it saddens me to notify you of my immediate resignation from the communications teams.
>
> The institute's either inability or unwillingness to protect myself and my peers from a clear and imminent threat has been disheartening to say the least. To know that Emerson is still not formally fired and that 11 girls complaining is not enough for IIEP and GWU to ensure his dismissal is, frankly, grossly astounding.
>
> I hope the situation is eventually resolved, but after putting forth so many months of fighting for my safety and seeing little to nothing happening, I am no longer willing to work under the Institute.

110.    On March 27, 2018, Jane Doe 2 received a telephone call from the Director of

IIEP, Maggie Chen. Director Chen said she was outraged by what happened and wanted Jones

to be fired ASAP. Director Chen said she asked Renner what he did to fire Jones, and Renner

said "nothing." Director Chen said she went to HR to have Jones fired and the HR department

replied, "this is not a HR issue, it is a Title IX issue." Director Chen then complained to GW's

Title IX Office which stated "we would need formal complaints from each of the victims," and

that it could not take any action until after the judiciary council completed its investigation.

Director Chen stated that she then complained to GW's Office of the General Counsel, which

reiterated that the complaints would need to be processed by the Title IX Office. When Director

Chen proclaimed that she had "cause to terminate him," the General Counsel's Office said "that's not fair to Jones." Director Chen stated, "I was told that until [Jones] has his due process, there is nothing I can do….I am so frustrated by this system…it is not good." During this call, Director Chen further stated that there is "absolutely no training" on sexual harassment. Director Chen ended the call by stating that "I was told all 11 girls must come file formal complaints, otherwise GW won't do anything. I am prohibited from terminating….[but] I won't renew his contract at the end of the year."

111.    GW's response—nothing.

112.    On March 30, 2018, Jane Doe 3 encountered Renner on GW's campus. Renner pressed to know why Jane Doe 2 would not return Renner's calls. Jane Doe 3 replied that Jane Doe 2 "is not comfortable speaking with you." Renner then stated that he was "very concerned that [the Plaintiffs'] group chat with the eleven [victims] was spreading misinformation and that [the Plaintiffs] were making the situation worse." In doing so, Renner attempted to discourage Jane Doe 3 and the Plaintiffs from pursuing their complaints of harassment.

113.    On April 2, 2018, Jane Doe 2 met with Jen Alexander-Smith of the Office of Student Rights & Responsibilities at GW ("Student Rights Office"). The Students Rights Office stated that it had learned of Plaintiffs' complaints on March 31, 2018, although their Complaints had been made months earlier. The Student Rights Office stated it is prohibited from becoming involved in work place problems. The Student Rights Office stated, ***"we have no policies in place regarding student problems in the workplace….there is absolutely no policy for harassment of students in the workplace."*** Jane Doe 2 proclaimed that "this is an unsafe work environment, and something needs to be done." The Student Rights Office said, "this is a gray area, we have no policy in place for this…we cannot write policy for every possible complaint

Klaproth Law
406 5ᵀᴴ Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

that we could come across." The Student Rights Office further admitted that it never received any complaint from Title IX or Renner about Jones' misconduct. The Student Rights Office further stated that according to Title IX, it had not yet started an investigation because it had not received a "formal" complaint.

114.    To date, Jones is still employed by GW in the IIEP workplace.

### COUNT I
### HOSTILE WORK ENVIRONMENT IN VIOLATION
### OF THE D.C. HUMAN RIGHTS ACT
### (All Defendants)

115.    Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

116.    During Plaintiffs' employment, a severe and pervasive hostile environment existed in violation of the D.C. Human Rights Act. Renner and Jones made sexually charged comments and touched Plaintiffs' inappropriately thereby creating a sexually hostile environment. Further, Jones' sexual assault of Jane Doe 4, Jane Doe 5 and Jane Doe 2 created a sexually hostile work environment. Renner's and Jones' sexual hostility towards Plaintiffs was pervasive and regular. Plaintiffs dealt with their sexually charged comments and hostile behavior on a daily basis. Indeed, Jones' sexual animus towards the female employees in the IIEP was a pattern and practice of discriminatory conduct that pervaded the workplace at GW and subjected all employees to a hostile environment.

117.    Defendants GW and Renner fostered, accepted, ratified, and/or otherwise failed to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of Plaintiffs because of their gender. *Respondeat superior* liability further exists because Renner and Jones were Plaintiffs' supervisors or managers, and therefore

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

an agent of GW.

118.    As a direct and proximate result of Defendants' violation of the D.C. Human Rights Act, Plaintiffs have suffered economic and non-economic damages set forth herein and has incurred attorneys' fees and costs. Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory and retaliatory acts unless, and until, the Court grants the relief requested herein.

119.    Defendants' violations of the D.C. Human Rights Act were willful and warrant the imposition of punitive damages.

120.    Plaintiffs seek affirmative relief which may include, but is not limited to, requiring Defendants to post the avenues to address complaints of workplace harassment, discrimination, and retaliation; requiring Defendant's employees to undergo discrimination, sexual harassment and retaliation training; terminating Emerson Jones; and any other equitable relief as the Court deems appropriate, compensatory damages, attorneys' fees, costs and disbursements of this action.

121.    WHEREFORE, Plaintiffs pray for relief in the form of a judgment against Defendants, jointly and severally, by awarding (1) compensatory damages; (2) punitive damages; (3) equitable relief, including back pay and front pay; (4) costs and attorney's fees; (5) punitive damages; and (6) any other relief the Court deems proper.

**COUNT II**
**RETALIATION IN VIOLATION OF THE D.C. HUMAN RIGHTS ACT**
**(All Defendants)**

122.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint as if fully set forth herein.

123.    Defendants retaliated against Plaintiffs by forcing them to work from home,

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

disciplining them, reducing their hours, and terminating them from their employment with GW.

124.    The harassing, reckless, wrongful, willful and malicious treatment of the Plaintiffs, by the Defendants solely because Plaintiffs made complaints of sexual harassment and objected to discriminatory conduct and/or participated in a claim of discrimination, or witnessed to discrimination; constitutes denial of equal opportunity, terms, conditions, and perquisites of employment and is retaliation with the meaning of the D.C. Human Rights Act.

125.    Plaintiffs engaged in statutorily protected activity when they exercised their rights under the D.C. Human Rights Act by complaining of Jones' sexual harassment to their supervisor, Renner.

126.    GW took no remedial measures in response to Plaintiffs' complaints. Instead the hostile environment continued and grew worse as more unsuspecting women were preyed upon by Jones.

127.    Instead of taking remedial measures against the sexual harassment by Jones, Defendants instead retaliated against the Plaintiffs. Jones, the sexual deviant and sociopath, is still employed by GW. While on the other hand, Jane Doe 2 and Jane Doe 1 are not.

128.    As a result of Defendants' harassing, reckless, unlawful, wanton and malicious retaliatory conduct, Plaintiffs have suffered economic and non-economic damages set forth herein and has incurred attorneys' fees and costs. Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants discriminatory and retaliatory acts unless and until the Court grants the relief requested herein.

129.    Defendants' retaliation in violation of the D.C. Human Rights Act was willful and warrant the imposition of punitive damages.

130.    Plaintiffs seek affirmative relief which may include, but is not limited to,

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

requiring Defendants to post the avenues to address complaints of workplace harassment, discrimination, and retaliation; requiring Defendant's employees to undergo discrimination, sexual harassment and retaliation training; terminating Emerson Jones; and any other equitable relief as the Court deems appropriate, compensatory damages, attorneys' fees, costs and disbursements of this action.

131.    WHEREFORE, Plaintiffs pray for relief in the form of a judgment against Defendants, jointly and severally, by awarding (1) compensatory damages; (2) punitive damages; (3) equitable relief, including back pay and front pay; (4) costs and attorney's fees; (5) punitive damages; and (6) any other relief the Court deems proper.

## COUNT III
## GENDER DISCRIMINATION IN VIOLATION
## OF THE D.C. HUMAN RIGHTS ACT
### (All Defendants)

132.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint as if fully set forth herein.

133.    Defendants discriminated against Plaintiffs on the basis of their gender in violation of the DCHRA by, *inter alia*, subjecting them to a hostile work environment because of their gender; subjecting them to different terms and conditions of their employment – specifically advising them to work from home – because of their gender; subjecting them to sexually suggestive remarks, and sexually suggestive touching because of their gender; subjecting them to a workplace environment where they were forced to silently endure sexual advances and sexual advancement to maintain their positions; subjecting them to a workplace environment where regular and pervasive comments were made demeaning women in general; subjecting them to a workplace environment with regular and persistent unwelcome sexual

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

advances, requests for sexual favors, verbal and physical harassment because of their gender; failing to take Plaintiffs' complaints of sexual harassment and hostile work environment seriously because of their gender; creating a workplace where women are subordinate to men and subject to physical touching, demeaning, and insulting comments because of their gender; providing due process rights to men (specifically to Jones) greater than those afforded to Plaintiffs because of their gender; and implementing and executing Title IX investigations and procedures differently for female students because of their gender.

134.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the DCHRA, Plaintiffs have suffered economic and non-economic damages set forth herein and has incurred attorneys' fees and costs. Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory acts unless, and until, the Court grants the relief requested herein.

135.    Defendants' violations of the D.C. Human Rights Act were willful and warrant the imposition of punitive damages.

136.    Plaintiffs seek affirmative relief which may include, but is not limited to, requiring Defendants to post the avenues to address complaints of workplace harassment, discrimination, and retaliation; requiring Defendant's employees to undergo discrimination, sexual harassment and retaliation training; terminating Emerson Jones; and any other equitable relief as the Court deems appropriate, compensatory damages, attorneys' fees, costs and disbursements of this action.

WHEREFORE, Plaintiffs pray for relief in the form of a judgment against Defendants, jointly and severally, by awarding (1) compensatory damages; (2) punitive damages; (3) equitable relief, including back pay and front pay; (4) costs and attorney's fees; (5) punitive

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

damages; and (6) any other relief the Court deems proper.

## COUNT IV
## AIDING AND ABETTING A VIOLATION
## OF THE D.C. HUMAN RIGHTS ACT
### (All Defendants)

137.    Plaintiffs reallege and incorporate by reference the allegations contained in the

preceding paragraphs of this Amended Complaint as if fully set forth herein.

138.    The DCHRA makes it "an unlawful discriminatory practice for any person to aid,

abet, invite, compel, or coerce the doing of any of the acts forbidden under" the DCHRA. D.C.

Code §2-1402.62

139.    Renner and GW knew or should have known about Jones and Renner's

discriminatory and retaliatory conduct in violation of the DCHRA and failed to stop it.

140.    Renner and GW unlawfully aided and abetted the discriminatory and retaliatory

conduct by Renner and Jones.

141.    As a direct and proximate result of Defendants' aiding and abetting the unlawful

discriminatory conduct in violation of the DCHRA, Plaintiffs have suffered economic and non-

economic damages set forth herein and has incurred attorneys' fees and costs. Plaintiffs are now

suffering and will continue to suffer irreparable injury and monetary damages as a result of

Defendants' discriminatory acts unless, and until, the Court grants the relief requested herein.

142.    Defendants' violations of the D.C. Human Rights Act were willful and warrant

the imposition of punitive damages.

143.    Plaintiffs seek affirmative relief which may include, but is not limited to,

requiring Defendants to post the avenues to address complaints of workplace harassment,

discrimination, and retaliation; requiring Defendant's employees to undergo discrimination,

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

sexual harassment and retaliation training; terminating Emerson Jones; and any other equitable relief as the Court deems appropriate, compensatory damages, attorneys' fees, costs and disbursements of this action.

WHEREFORE, Plaintiffs pray for relief in the form of a judgment against Defendants, jointly and severally, by awarding (1) compensatory damages; (2) punitive damages; (3) equitable relief, including back pay and front pay; (4) costs and attorney's fees; (5) punitive damages; and (6) any other relief the Court deems proper.

## COUNT V
## NEGLIGENT TRAINING, SUPERVISION, AND RETENTION
### (GW only)

144.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint as if fully set forth herein.

145.    GW had a duty to train its employees and to supervise its employees. GW breached its duty to exercise reasonable care by acting negligently and recklessly in the following specific respects and without limitation:

a.    Failing to provide formal training on sexual harassment in the workplace;

b.    Failing to supervise Renner and Jones in the IIEP office;

c.    Failing to adopt policies to receive and process complaints of sexual harassment in the IIEP office;

d.    Failing to adopt policies to prevent sexual harassment in the IIEP office;

e.    Failing to discipline employees for sexual harassment;

f.    Failing to discipline Renner and Jones in connection with the sexual harassment in the IIEP office; and,

g.    Failing to investigate complaints of sexual harassment in the IIEP office.

146.    It was foreseeable to the GW that the failure to train its employees, including

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

Renner and Jones, would result in the sexual harassment in the IIEP office and cause harm to its employees, such as the Plaintiffs. As a direct and proximate result of the GW's failure to exercise reasonable care, Plaintiffs have suffered and will continue to suffer much physical pain and mental anguish; have incurred medical expenses and will continue to incur medical expenses; and have suffered and will continue to suffer mental and physical pain, and emotional distress.

147.    WHEREFORE, Plaintiffs pray for relief in the form of a judgment awarding compensatory damages, punitive damages, and any other relief the Court deems proper

### COUNT VI
### VIOLATION OF TITLE IX
### (20 U.S.C. § 1681, *et seq.*)
### (GW's Deliberate Indifference to Sexual Harassment)

148.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Amended Complaint as if fully set forth herein.

149.    The sex-based harassment endured by Plaintiffs was so severe, pervasive, and objectively offensive that it deprived Plaintiffs of access to educational opportunities or benefits provided by GW.

150.    GW created and/or subjected Plaintiffs to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), because

   a.   Plaintiffs are members of a protected class;

   b.   Plaintiffs were subjected to sexual harassment in the form of a sexual assault and/or harassment by another student;

   c.   Plaintiffs were subjected to harassment based on their sex; and

   d.   Plaintiffs were subjected to a hostile educational environment created by GW's lack of policies and procedures and failure to properly investigate

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

and/or address the sexual assault and subsequent harassment.

151.    GW and its officials had actual knowledge of sexual assaults and harassment committed by Jones, and the resulting harassment of Plaintiffs created by GW's failure to investigate and discipline Jones in a timely manner and consistent with its own policy and federal and state law.

152.    GW's failure to promptly and appropriately respond to the alleged sexual harassment, resulted in Plaintiffs, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in GW's education program in violation of Title IX.

153.    GW failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward Plaintiffs.

154.    GW persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiffs.

155.    GW engaged in a pattern and practice of behavior designed to discourage and dissuade students and parents of students who had been sexually assaulted from seeking prosecution and protection and from seeking to have sexual assaults from being fully investigated.

156.    This policy and/or practice constituted disparate treatment of females had a disparate impact on female students, such as Plaintiffs.

157.    Plaintiffs have suffered emotional distress and psychological damage, and their character and standing in her community have suffered from the harassment fostered as a direct and proximate result of GW's deliberate indifference to their rights under Title IX.

158.    WHEREFORE, Plaintiffs pray for relief in the form of a judgment against

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

Defendants, jointly and severally, by awarding (1) compensatory damages; (2) punitive

damages; (3) equitable relief, including back pay and front pay; (4) costs and attorney's fees; (5)

punitive damages; and (6) any other relief the Court deems proper.

### COUNT VII
### VIOLATION OF TITLE IX
### (20 U.S.C. § 1681, *et seq.*)
### (GW's Retaliation by Withholding Protections Conferred by Title IX)

159.   Plaintiffs reallege and incorporate by reference the allegations contained in the

preceding paragraphs of this Amended Complaint as if fully set forth herein.

160.   Immediately after Plaintiffs notified Defendants of the sexual assaults committed

by Jones, Defendants retaliated against Plaintiffs by denying them their rights under Title IX,

including without limitation, the following rights:

a.   Respectful treatment throughout the process, regardless of outcome;

b.   University counseling services;

c.   Be informed about the student judicial process on an ongoing basis;

d.   Access case file within legal parameters;

e.   A no contact order with the other party throughout the process;

f.   To have an advisor of your choosing present with you during any and all phases of the investigation and hearing;

g.   A thorough, prompt, and equitable investigation and resolution of a complaint;

h.   Opportunity to submit a written statement addressing the allegations and to provide evidence and witnesses;

i.   Be informed of the university's code of conduct for students, faculty, and staff, including anticipated timelines and possible outcomes of a complaint;

j.   Request protective measures, remedies, support, and resources;

Klaproth Law
406 5ᵀᴴ Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

k.  Protection against retaliation from any university staff or student;

l.  A free forensic exam from a Sexual Assault Nurse Examiner;

m. The option to notify law enforcement, independent of campus process;

n.  Receive assistance modifying academic or housing situation; and,

o.  Not to have to interact face-to-face with the respondent at any time during the process.

161.    WHEREFORE, Plaintiffs pray for relief in the form of a judgment against Defendants, jointly and severally, by awarding (1) compensatory damages; (2) punitive damages; (3) equitable relief, including back pay and front pay; (4) costs and attorney's fees; (5) punitive damages; and (6) any other relief the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, each Plaintiff individually prays for relief in the form of a judgment against all Defendants, jointly and severally, for compensatory damages in the amount $5,000,000; punitive damages in the amount of $25,000,000; equitable relief; pre- and post-judgment interest; costs; attorney's fees; and any other relief the Court deems proper and just.

## JURY AND TRIAL DEMAND

Plaintiffs hereby demand a trial by jury with respect to each claim in this Amended Complaint.

Respectfully submitted,

/s/ Brendan J. Klaproth
Brendan J. Klaproth (D.C. Bar No. 999360)
Jesse C. Klaproth (D.C. Bar No. PA0063)
Klaproth Law PLLC
406 5th Street NW
Suite 350
Washington, DC 20001
Tel: 202-618-2344
Email: Bklaproth@klaprothlaw.com

Klaproth Law
406 5TH Street NW
Suite 350
Washington, D.C. 20001
———
klaprothlaw.com

*Attorney for Plaintiffs*

Klaproth Law
406 5ᵀᴴ Street NW
Suite 350
Washington, D.C. 20001
————
klaprothlaw.com