# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| _____ ) | |
| JANE DOE 1, <u>et al.</u>, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 18-1391 (RBW) |
| ) | |
| THE GEORGE WASHINGTON ) | |
| UNIVERSITY, <u>et al.</u>, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION</u>

The plaintiffs filed this civil action, using the pseudonyms Jane Does 1 to 5, against George Washington University ("GW") and Kyle Renner, a GW employee being sued in his capacity as GW's General Operations Manager and the plaintiffs' supervisor (collectively, "the defendants"), pursuant to the District of Columbia's Human Rights Act ("D.C. Human Rights Act"), D.C. Code §§ 2-1401–1404.04 (2001), alleging that the defendants (1) created a hostile work environment ("Count I"), (2) retaliated against them for their complaints of sexual harassment ("Count II"), (3) discriminated against them because of their gender ("Count III"), and (4) aided and abetted the discriminatory and retaliatory conduct ("Count IV"). First Amended Complaint And Jury Demand ("Am. Compl.") ¶¶ 116, 123, 133, 140. The plaintiffs bring an additional three claims against GW for (1) negligent training and supervision ("Count V"); (2) indifference to sexual harassment in violation of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. §§ 1681–88 (2018) ("Count VI"); and (3) retaliation in violation of Title IX ("Count VII"). Am. Compl. ¶¶ 145, 149–50, 160. Currently before the Court are (1) the Defendants' Motion to Dismiss All Claims of Plaintiffs Jane Doe 1 and Jane

Doe 3 and All Plaintiffs' Claims in Counts III and V of the Complaint ("Defs.' Mot."), (2) the

Defendants' Motion to Dismiss the First Amended Complaint ("Defs.' 2d Mot."), and (3) the

Plaintiffs' Motion for Leave to Proceed with the Pseudonyms Jane Does 1–5 ("Pls.' Mot.").

Upon careful consideration of the parties' submissions,[1] the Court concludes for the reasons

below that the defendants' motion to dismiss the Complaint must be denied as moot,[2] the

plaintiffs' motion for leave to proceed pseudonymously should be granted, and the defendants'

motion to dismiss the Amended Complaint must be granted in part and denied in part.

## I. BACKGROUND

All five plaintiffs are female undergraduate students who attend GW. Am. Compl. ¶¶ 24,

37, 46, 71, 83. During the time period relevant to their claims against the defendants, the

plaintiffs worked in various roles at the Institute for International Economic Policy ("IIEP"), see

id., which is located within the Elliott School of International Affairs at GW, id. ¶ 17. Emerson

Jones, one of the alleged perpetrators of the harassing conduct who is not a party to this action,

was also employed by the IIEP in a supervisory position. Id. ¶ 19. When Jones began working

at the IIEP, all of the plaintiffs, with the exception of Jane Doe 1, were already working there.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Defendants' Memorandum in Support of [the Defendants'] Motion to Dismiss the First Amended Complaint ("Defs.' 2d Mem."); (2) the Plaintiffs' Memorandum of Points and Authorities in Opposition to [the] Defendants' Motion to Dismiss [the] First Amended Complaint ("Pls.' Opp'n"); (3) the Defendants' Reply Memorandum in Further Support of [the Defendants'] Motion to Dismiss the First Amended Complaint ("Defs.' Reply"); (4) the [Plaintiffs'] Statement of Points and Authorities in Support of [the] Plaintiffs' Motion for Leave to Proceed with the Pseudonyms Jane Does 1–5 ("Pls.' Mem."); (5) the Defendants' Opposition to [the] Plaintiffs' Motion for Leave to Proceed with the Pseudonyms Jane Does 1–5 ("Defs.' Opp'n"); and (6) the [Plaintiffs'] Reply Brief in Support of [the] Plaintiffs' Motion for Leave to Proceed with the Pseudonyms Jane Does 1–5 ("Pls.' Reply").

[2] The defendants filed a motion to dismiss the Complaint in its entirety as to Jane Does 1 and 3, as well as Counts III and V as to the remaining plaintiffs, for failure to state a claim. "This motion became moot when [the] plaintiff[s] filed [their] [ ] Amended Complaint and therefore will be denied." Baltierra v. W. Va Bd. of Med., 253 F. Supp. 2d 9, 14 (D.D.C. 2003) (Walton, J.).

See id. ¶¶ 24, 37, 71, 85.  Later in the fall of 2017, Jane Doe 1 began her employment at the

IIEP.  See id. ¶ 46.  The following are the plaintiffs' relevant allegations.

## A.    Jones's Alleged Conduct

According to the plaintiffs, beginning in March 2017, IIEP staff members complained to

Renner about Jones's behavior.  See id. ¶ 91.  These complaints were allegedly largely ignored

by Renner by his silencing of female complainants.  See id.  In general, Jones would purportedly

"frequently brag in the workplace about his sexual exploitation of the women in the workplace."

Id. ¶ 34.  For example, Jones allegedly "publicly announced to the IIEP staff members his sexual

rating of the female coworkers from best to worse."  Id. ¶ 32.  On another occasion, he

purportedly described one of the women he raped as "a dead fish because she was so drunk."  Id.

Jones was also allegedly verbally abusive to women employed in the IIEP.  On one

occasion, Jane Doe 2's coworker purportedly informed her that "Jones had been 'degrading' Jane

Doe 2."  Id. ¶ 33.  In addition, Jane Doe 5 contends that she personally "observed Jones shut

down a female coworker after the female coworker requested that Jones stop verbally harassing

her."  Id. ¶ 86.  Jones allegedly became extremely aggressive, belittled her, and told the female

coworker that she needed to stop being "emotional" and to get "used to this type of behavior in a

work environment."  Id.[3]  Jane Doe 5 also contends that she heard "Jones talk to other

coworkers in the workplace about women in a sexually demeaning way and has heard Jones brag

about his sexual experiences."  Id. ¶ 87.

---

[3] The plaintiffs also allege that, on one occasion, after a female coworker "stood up to Jones . . . to address his misogynistic conduct," Jones shouted at her and stated that she would "have to get used to things like that if [she] ever want[ed] to be successful in a work environment."  Am. Compl. ¶ 41.  However, it is unclear whether the plaintiffs are referencing the same occurrence.  Because of the similarities of Jones's statements, the Court will construe it as the same incident.

"The female workers, including Jane Doe 5, felt extremely uncomfortable around Jones due to his aggressive behavior and misogynistic comments." Id. ¶ 85. According to Jane Doe 5, Jones would intentionally refer to the female employees by "the incorrect names claiming that all the women in the office are the same." Id. ¶ 88. He also allegedly referred to new female staff members as his "new office crush[es]." Id. ¶ 42.

## 1. Jane Doe 1

Less than a month after Jane Doe 1 started working at the IIEP, Jones allegedly began harassing her. On October 1, 2017, she contends that Jones sent her a text message stating, "oh my god you're so hot." Id. ¶ 48. Within a week, on October 6, 2017, Jones allegedly asked Jane Doe 1 to come to his house, but she refused. Id. ¶ 49. According to Jane Doe 1, later that month, "[o]n October 26, 2017, [she] learned that Jones had threatened to kill her female coworker," which made Jane Doe 1 fearful of Jones. Id. ¶ 50. And on November 9, 2017, Jane Doe 1 contends that she received a text message from a female coworker, asking Jane Doe 1 if Jones had left the office. See id. ¶ 51. Jane Doe 1 represents that the coworker told her that she was hiding from Jones in fear that he would sexually assault her. See id.

Two days prior to an upcoming performance,[4] Jane Doe 1 contends that she told Jones that she was "stressed about her [ ] performance." Id. ¶ 52. Jones allegedly asked if he could attend the performance, but Jane Doe 1 represents that she told him no. See id. On December 9, 2017, Jones allegedly sent Jane Doe 1 a text message, "containing a picture of [Jane Doe 1] during her performance." Id. ¶ 53. Apparently, despite Jane Doe 1's objections, Jones had

---

[4] It is unclear from the Amended Complaint what is being referenced by the term "performance," e.g., the performance of a job or non-job related activity, or an evaluation of Jane Doe 1's performance.

attended the performance.  See id.  Three days later, Jones purportedly again asked Jane Doe 1 on a date, which she refused.  Id. ¶ 54.

On December 19, 2017, Jane Doe 1 filed a complaint with Renner regarding Jones's behavior.  See id. ¶ 58.  After Jane Doe 1 "described Jones'[s] behavior toward her, and [ ] stated that one of her female coworkers had been raped[,] Renner responded, 'sometimes you need to work with people that you don't necessarily get along with.'"  Id.  On December 21, 2017, a Title IX investigator contacted Jane Doe 1 by email in response to her complaint, but allegedly "took no action beyond that email and failed to conduct any independent investigation beyond reaching out to the complainant."  Id. ¶ 63.  On January 30, 2018, Jane Doe 1 allegedly heard "Jones openly discuss[ing] his sexual exploits in the workplace," and began "demean[ing] the women he 'slept with.'"  Id. ¶ 64.

Following Jane Doe 1's December 19, 2017 initial complaint to Renner, she contends that Jones "deliberately and intentionally increased his hostility towards her."  Id. ¶ 66.  For example, on February 1, 2018, Jane Doe 1 contends that "Jones treat[ed her] with hostility and harassed her as she quietly did her work."  Id.  Immediately thereafter, Jane Doe 1 represents that she observed Jones and Renner discussing something in Renner's office.  See id.  "As a result, Jane Doe 1's supervisor told her that she was not allowed to work the event that evening even though the event was understaffed."  Id.

On February 7, 2018, "Jane Doe 1 requested that she be demoted to [e]vent staff so that she would not have to interact with Jones anymore."  Id. ¶ 67.  "Jane Doe 1 was also given the option of working from home."  Id. ¶ 68.  Two days later, Jane Doe 1 met with the GW's Assistant Director for Sexual Assault Prevention and Response for the Office for Diversity, Equity, and Community Engagement ("ODECE"), and reported "Jones'[s] sexual harassment

and sexual assault of Jane Doe 5." Id. ¶ 99. On March 6, 2018, Jane Doe 1 learned that her complaint to the ODECE would be treated as "student-on-student harassment," "rather than 'staff-on-staff harassment' even though the harassment was occurring in the IIEP workplace." Id. ¶¶ 99, 105.

On April 2, 2018, Jane Doe 1 contends that she was constructively discharged, having been "forced to resign out of her fear of interacting with Jones in the IIEP office." Id. ¶ 69.

### 2. Jane Doe 2

In May 2017, "Jones [allegedly] asked Jane Doe 2 to come over to his apartment." Id. ¶ 26. According to Jane Doe 2, "[o]nce there, Jones ignored Jane Doe 2's objections [to sexual activity] and sexually assaulted her." Id. "Jane Doe 2 [contends that although she] tried to push Jones off of her . . . [and] told him to stop multiple times, . . . Jones raped Jane Doe 2." Id.

Throughout the fall of 2017, "Jones [allegedly] continued to torment Jane Doe 2." Id. ¶ 31. On one occasion, Jane Doe 2 contends that Jones told her that he would "never stick[ his] dick into the pool of IIEP ever again." Id. Jones also purportedly "told Jane Doe 2's faculty supervisors and her coworkers" that he and Jane Doe 2 had sex. Id. ¶ 33.

On February 2, 2018, Jane Does 2 and 3 met with Renner. See id. ¶ 97. "Jane Doe 2 told Renner . . . that Jones had raped her" and two other girls in the IIEP office. Id. Jane Doe 2 "also gave Renner a written statement that detailed Jones'[s] sexually hostile conduct and misogynistic comments in the workplace." Id. Renner responded that he would "talk to the Title IX office to see what he should do." Id. Renner then "recommended that Jane Doe 2 work from home." Id. On February 11, 2018, Jane Doe 2 observed Jones in the office and emailed Renner, stating, "I was wondering if we could have a follow-up meeting. Let me know if you are free

soon." Id. ¶ 100. However, Renner purportedly never responded to Jane Doe 2's email. See id.

Instead, during Jane Doe 2's professional development meeting with Renner on February 23, 2018, she contends that "Renner told [her] that to 'follow-up' on her complaint about Jones, there was nothing [he] could do because his 'hands were tied.'" Id. ¶ 101. Jane Doe 2 represents that she requested that Renner fire Jones, but Renner repeatedly responded that his "hands were tied" and that "Jane Doe 2 had to file an 'official complaint with the Title IX office.'" Id. According to Jane Doe 2, she "complained that it was unacceptable that . . . she had to work beside the man [who] raped her." Id. Renner allegedly concluded the meeting by "stating that Jane Doe 2 should work from home and go to therapy." Id.

On March 7, 2018, Jane Doe 2 informed Renner in writing that "four female employees 'and I want to discuss how we feel unsafe in the office.'" Id. ¶ 106. Two days later, the plaintiffs, including Jane Doe 2, met with Renner. See id. ¶ 107.

> During this meeting, each of the [p]laintiffs detailed the sexual harassment they were exposed to in the workplace, Jones'[s] sexual assaults on female staff members, Jones'[s] demeaning treatment of the female staff members, and Jones'[s] threat to kill a female staff member. The [p]laintiffs also read written statements prepared by two other girls. The [p]laintiffs told Renner that at least 11 female staff members had been impacted by Jones'[s] hostile conduct. The [p]laintiffs told Renner that they felt unsafe working with Jones.

Id. Renner allegedly responded that "he needed to utilize the 'correct mechanisms' to terminate Jones," but when pressed by the plaintiffs, he could not identify the "mechanisms." Id. Renner allegedly "stated that he did not want to ask Jones to work from home," id., and "instead asked the [p]laintiffs to work from home," id. Jane Does 1, 3, 4, and 5 provide consistent accounts of what Jane Doe 2 said transpired at the March 9, 2017 meeting with Renner.

"On March 26, 2018, Jane Doe 2 [contends that she] was constructively discharged by GW." Id. ¶ 35. In her resignation letter to Renner, Jane Doe 2 wrote that "[w]orking in the

recent months at [the] IIEP has been a terrible experience," that the IIEP's "inability or unwillingness to protect [her] . . . from a clear and imminent threat has been disheartening," and that "after putting forth so many months of fighting for my safety and seeing little to nothing happening, I am no longer willing to work under the [IIEP]." Id. ¶ 109.

The next day, Jane Doe 2 received a phone call from the Director of the IIEP, Maggie Chen. Id. ¶ 110. Director Chen allegedly told Jane Doe 2 that she "asked Renner what he did to fire Jones, and Renner said 'nothing.'" Id. According to Director Chen, after she requested human resources to fire Jones, human resources responded that "this is not a [human resources] issue, it is a Title IX issue." Id. Director Chen also "complained to GW's Title IX [o]ffice[,] which stated '[it] would need formal complaints from each of the victims,' and that it could not take any action until after the judiciary council completed its investigation." Id. Finally, Director Chen "complained to GW's Office of the General Counsel, which reiterated that the complaints would need to be processed by the Title IX [o]ffice." Id. When Director Chen indicated that "she had 'cause to terminate [Jones],'" the General Counsel's Office said 'that's not fair to Jones.'" Id. Director Chen "was told that until [Jones] ha[d] his due process, there [was] nothing [she] could do." Id. (first alteration in original). Director Chen also allegedly informed Jane Doe 2 "that there is 'absolutely no training' on sexual harassment." Id.

"On April 2, 2018, Jane Doe 2 met with Jen Alexander-Smith from the Office of Student Rights and Responsibilities at GW ('Student Rights Office')." Id. ¶ 113. According to Jane Doe 2, "[t]he Student Rights Office stated that it had learned of the [p]laintiffs' complaints on March 31, 2018." Id. The Student Rights Office allegedly stated that "it is prohibited from becoming involved in [workplace] problems," and that it has "no policies in place regarding student problems in the workplace" and "absolutely no policy for harassment of students in the

workplace." Id. "The Student Rights Office further admitted that it had never received any complaint from [the] Title IX [office] or Renner about Jones'[s] misconduct." Id. The Student Rights Office stated "that according to [the] Title IX [office], it had not yet started an investigation because it had not received a 'formal' complaint." Id.

### 3. Jane Doe 3

According to Jane Doe 3, a number of her coworkers confided in her about Jones's "sexual misconduct and inappropriate conduct in the office," id. ¶ 77, and in her position as Digital Communications and Social Media Team Lead, Jane Doe 3 contends that she became aware that Jones had assaulted three female employees in the office, see id. Jane Doe 3 represents that she received two written complaints in a suggestion box about Jones's "sexually hostile behavior." Id. One female employee purportedly complained to Jane Doe 3 that "Jones had been asking underage female workers to 'get drunk' with him after work." Id. Jane Doe 3 also allegedly received complaints "that Jones had been discussing his sexual encounter with Jane Doe 2 [ ] in the IIEP office." Id. ¶ 78.

Jane Doe 3 contends that she filed at least four formal complaints with her supervisors about Jones's sexual harassment and assaults. See id. ¶ 79. On February 2, 2018, Jane Does 2 and 3 met with Renner to discuss Jones's conduct toward Jane Doe 2. See id. ¶ 97. On February 28, 2018, Jane Doe 3 met with Renner and told him that "she believed Jane Doe 2 would be quitting [the] IIEP because [Renner] would not take action in response to her complaint." Id. ¶ 103. Renner allegedly responded that "his 'hands were tied'" and "it was 'a difficult situation.'" Id.

On March 30, 2018, Jane Doe 3 "encountered Renner on GW's campus." Id. ¶ 112. According to Jane Doe 3, "Renner stated that he was 'very concerned that [the plaintiffs'] group chat with the eleven [victims] was spreading misinformation and that [the plaintiffs] were making the situation worse.'" Id.

### 4. Jane Doe 4

On September 30, 2017, Jane Doe 4 was at a nightclub with other IIEP staff when "Jones [allegedly] bought . . . Jane Doe 4[] an excessive number of alcoholic drinks." Id. ¶ 43. Later, Jones allegedly asked Jane Doe 4 to come back to his apartment, and because he "was older than her and her boss at [the] IIEP, [Jane Doe 4 contends that she] felt she had no choice." Id. "At Jones'[s] apartment, Jane Doe 4 slipped in and out of consciousness, as she was [ ] grossly intoxicated." Id. According to While Jane Doe 4, while she was "inebriated and unresponsive [ ], Jones took off her clothes, climbed on top of her[,] and raped [her]." Id. She also contends that "[t]he next morning, she awoke to Jones, again, attempting to rape her." Id.

After purportedly raping Jane Doe 4, the Amended Complaint represents that "Jones bragged in the workplace about his encounter to Jane Doe 4's coworkers." Id. ¶ 44. "He [allegedly] made humiliating, derogatory sexual comments about Jane Doe 4 to her coworkers and the faculty members working in the IIEP." Id. Purportedly, Jones "publicly ranked Jane Doe 4 among the other females in the office that he had victimized." Id. ¶ 44.

### 5. Jane Doe 5

In April 2017, "Jane Doe 5 [represents that she] attended a party in a GW dorm room that was hosted by her IIEP coworker." Id. ¶ 90. When the party ended, Jones allegedly "pressured Jane Doe 5 to leave with him," and "Jones began [to] assault [her] in the car." Id. According to Jane Doe 5, when she arrived at Jones's house, "she 'blacked out' and lost consciousness. She then came in and out of consciousness as Jones aggressively raped her." Id.

**B.     Renner's Alleged Conduct**

Renner, the individual purportedly "authorized to receive complaint[s] regarding workplace misconduct and [to] institute corrective measures," id. ¶ 57, allegedly "was also involved in his own workplace misconduct." Id. ¶ 61.  He purportedly made misogynistic and "derogatory comments about women in the workplace, such as disparaging 'women's studies.'" Id. ¶ 62.  In addition, Renner allegedly tried to cover up Jones's misconduct by "brush[ing] aside the complaints made by [the p]laintiffs and others" rather than "report[ing] Jones to the police or to the University" because Jones and Renner were allegedly "close friends." Id. ¶ 60.

Moreover, Renner would allegedly touch Jane Doe 1 and 3.  According to Jane Doe 1, during her employment, on multiple occasions, "Renner touch[ed] the small of Jane Doe 1's back while in the workplace, without her permission." Id. ¶ 61.  Renner would also allegedly subject Jane Doe 3 to sexually hostile conduct. See id. ¶ 73.  He would purportedly "touch Jane Doe 3's arm or shoulder" while walking beside her, and while Jane Doe 3 was working at her computer, "Renner [would] frequently reach[ ] over [ ] Jane Doe 3 to type on her keyboard while she remain[ed] seated." Id.  He also allegedly "routinely commented on [] Jane Doe 3's clothing in the office." Id.  The plaintiffs also contend that "Renner gave preferential treatment to Jane Doe 3's co-team leader," id., and "would dismiss Jane Doe 3's recommendations in front of the staff, and instead request input from [her] male co-team leader," id. ¶ 75.  On one occasion, "during Jane Doe 3's professional development meeting, Renner [allegedly] asked Jane Doe 3 when she intended to get married and have kids." Id. ¶ 76.  He also allegedly "asked several female employees this question during their professional development meetings." Id.

## C.     This Lawsuit

On May 10, 2018, the plaintiffs filed their Complaint in the Superior Court of the District of Columbia.  On June 13, 2018, the defendants removed the case to this Court pursuant to 28 U.S.C. § 1441(a), (c) (2018).  See Notice of Removal (Corrected) at 2–4.  Thereafter, the defendants filed their motion to dismiss the Complaint for failure to state a claim.  See generally Defs.' Mot.  Instead of opposing the motion, the plaintiffs amended their Complaint.  See generally Am. Compl.  The defendants have now moved to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) on the basis that the plaintiffs failed to obtain leave to sue using pseudonyms.  See Defs.' 2d Mem. at 13–15.  The plaintiffs subsequently filed their motion seeking leave from the Court "to continue to proceed anonymously as Jane Does 1–5 throughout the remainder of this case."  Pls.' Mem. at 1.  These last two filings are the subject of this memorandum opinion.

## II.     LEGAL STANDARDS

## A.     Motion For Leave To Proceed with Pseudonyms

Federal Rule of Civil Procedure 10(a) requires that a complaint state all of the names of the parties.  Fed. R. Civ. P. 10(a). "Disclosure of the parties' identities furthers the public interest in knowing the facts surrounding judicial proceedings."  Doe v. Cabrera, 307 F.R.D. 1, 4 (D.D.C. 2014) (Walton, J.) (quoting Nat'l Ass'n of Waterfront Emp'rs v. Chao, 587 F. Supp. 2d 90, 99 (D.D.C. 2008)).

> The "rare dispensation" of allowing parties to proceed pseudonymously is only justified in the "critical case," or the "unusual case," . . . include[ing] those in which "identification creates a risk of retaliatory physical or mental harm," those in which "anonymity is necessary to preserve privacy in a matter of [a] sensitive and highly personal nature," and those in which the anonymous party would be compelled to admit criminal behavior or be subject to punishment by the state.

Qualls v. Rumsfeld, 228 F.R.D. 8, 10–11 (D.D.C. 2005); accord W. Coast Prods., Inc. v. Does 1–5829, 275 F.R.D. 9, 12 (D.D.C. 2011) ("[F]ederal courts generally allow parties to proceed anonymously . . . when anonymity is necessary to protect a person from harassment, injury, ridicule, or personal embarrassment."). Personal embarrassment is normally not a sufficient basis for permitting anonymous litigation. See Chao, 587 F. Supp. 2d at 100.

"[I]t is within the discretion of the district court to grant the 'rare dispensation' of anonymity." United States v. Microsoft Corp., 56 F.3d 1448, 1464 (D.C. Cir. 1995) (quoting James v. Jacobson, 6 F.3d 233, 238 (4th Cir. 1993)). In exercising this discretion, the Court has "a judicial duty to inquire into the circumstances of particular cases to determine whether the dispensation is warranted." Id. "As part of this inquiry, the court should take into account the risk of unfairness to the opposing party, as well as the customary and constitutionally-embedded presumption of openness in judicial proceedings." Id. (internal quotation marks omitted). "[I]t is the litigant seeking to proceed under pseudonym that bears the burden to demonstrate a legitimate basis for proceeding in that manner," Qualls, 228 F.R.D. at 13, and "motions to proceed under pseudonym should be granted sparingly," Doe v. U.S. Dep't of State, Civ. Action No. 1:15-01971, 2015 WL 9647660, at *2 (D.D.C. Nov. 3, 2015).

**B.      Motion to Dismiss**

A Rule 12(b)(6) motion tests whether a complaint "state[s] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss [under Rule 12(b)(6)], a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

In evaluating a motion to dismiss under Rule 12(b)(6), "the Court must construe the complaint in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Hettinga v. United States, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). While the Court must "assume [the] veracity" of any "well-pleaded factual allegations" in a complaint, conclusory allegations "are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678 (citing Twombly, 550 U.S. at 555). Also, the Court need not accept "legal conclusions cast as factual allegations," or "inferences drawn by [the] plaintiff if those inferences are not supported by the facts set out in the complaint." Hettinga, 677 F.3d at 476. The Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." E.E.O.C. v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

### III.    ANALYSIS

### A.    The Plaintiffs' Motion For Leave To Proceed with the Pseudonyms Jane Does 1 to 5

Although the District of Columbia Circuit has not yet adopted a test for evaluating a request to proceed pseudonymously, members of this Court have adopted a five-factor test "in balancing the interests involved." See, e.g., Sandberg v. Vincent, 319 F. Supp. 3d 422, 426

(D.D.C. 2018); see also Roe v. Bernabei & Wachtel PLLC, 85 F. Supp. 3d 89, 96 (D.D.C. 2015);

Cabrera, 307 F.R.D. at 5; Chao, 587 F. Supp 2d at 99. These factors are:

> [(1)] [w]hether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of a sensitive and highly personal nature; [(2)] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; [(3)] the ages of the persons whose privacy interests are sought to be protected; [(4)] whether the action is against a governmental or private party; and [(5)] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously.

Sandberg, 319 F. Supp. 3d at 426 (quoting James, 6 F.3d at 238). The Court will address each

factor in turn in assessing whether to grant the plaintiffs' motion.

### 1. Whether the Use of Pseudonyms Will Preserve Privacy in a Matter of a Sensitive and Highly Personal Nature

The plaintiffs maintain that "[b]ecause this case involves claims of multiple sexual

assaults, involving multiple plaintiffs, this case is sensitive and highly personal in nature for the

[p]laintiffs." Pls.' Mem. at 3 (quoting Cabrera, 307 F.R.D. at 6). The defendants respond that

this case does not involve a matter of a sensitive and highly personal nature for two reasons: (1)

"Jane Does 1 and 3 do not allege that they were sexually assaulted" or that Jones "ever touched

them improperly, or threatened them," Defs.' Opp'n at 6; and (2) although the remaining

plaintiffs have alleged they have been raped, this lawsuit does not involve a "brutal rape"

involving "graphic details," id. at 7.

As an initial matter, the Court agrees with the defendants that "[s]exual harassment is not

typically considered a matter so highly personal as to warrant proceeding by pseudonym."

Bernabei, 85 F. Supp. 3d at 96. However, although Jane Does 1 and 3 were subjected to sexual

harassment and not assault, the remaining plaintiffs do in fact allege that they were sexually

assaulted. Am. Compl. ¶¶ 26, 43, 90. Therefore, because courts generally allow a plaintiff to

litigate under a pseudonym in cases containing allegations of sexual assault on the basis that they concern highly sensitive and personal subjects, see Cabrera, 307 F.R.D. at 5; Doe v. De Amigos, LLC, Civ. Action No. 11-1755 (ABJ), 2012 WL 13047579, at *2 (D.D.C. Apr. 30, 2012), the need for anonymity is particularly great in this case because the IIEP is a "small" office, Pls.' Mem. at 3, and "[d]isclosure of the identity of any of the [p]laintiffs would necessarily lead to the disclosure of the identities [of all the plaintiffs]," id.

The defendants claim that because "all five [p]laintiffs are already well known in the IIEP office through [the p]laintiffs' own communications at meetings and on social media," Defs' Opp'n at 7, "the use of the true names of Jane Doe 1 and Jane Doe 3 in the lawsuit would [not] allow anyone to better guess the true identities of the other [p]laintiffs beyond the information already available," id. However, because the "extent of [these] disclosures does not reel in the public at large," Cabrera, 307 F.R.D. at 9 n.14 (citation omitted), the Court must "grant[ ] anonymity to protect against [public] disclosure" and preserve the privacy of sexual assault victims. De Amigos, LLC, 2012 WL 13047579, at *2.

The defendants also contend that "this case is unlike Bernabei because that was a suit against the alleged perpetrator of a brutal rape, in which the complaint included 'highly personal' matter[s] such as 'graphic details of the alleged rape, including multiple references to the plaintiff's genitalia and her hospital examination,'" Defs.' Opp'n at 7, while "the claims in this case are not made against the alleged perpetrator . . . ; no similarly 'graphic' details of the alleged sexual assaults are pled in the [Amended] Complaint; and the primary issue is not liability for the alleged rapes themselves," id. at 7–8. Although the Court acknowledges that the plaintiffs' Amended Complaint "is not against [their] assailant . . . but is instead at least one step removed" from the alleged incidents of sexual assault, Bernabei, 85 F. Supp. 3d at 97, the Court

agrees with the plaintiffs that it is "anticipated that the details of the sexual assaults will be relevant to this lawsuit in light of [the p]laintiffs' Title IX claims," Pls.' Reply at 2; but see Bernabei, 85 F. Supp. 3d at 97, and nevertheless recognizes the "strong [public] interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes," De Amigos, LLC, 2012 WL 13047579, at *2; see also Doe v. Penzato, Civ. Action No. 10-5154 (MEJ), 2011 WL 1833007, at *3 (N.D. Cal. May 13, 2011) ("Given [the p]laintiff's allegations of sexual assault, the Court finds that these reasons tend to favor allowing her to proceed anonymously."); Doe No. 2 v. Kolko, 242 F.R.D. 193, 195 (E.D.N.Y. 2006) ("[T]he public generally has a strong interest in protecting the identities of sexual assault victims so that other victims will not be deterred from reporting such crimes."); Doe v. Evans, 202 F.R.D. 173, 176 (E.D. Pa. 2001) (granting anonymity to sexual assault victim).

Accordingly, this factor weighs in favor of the plaintiffs proceeding pseudonymously.

### 2. Whether There is a Risk of Retaliatory Physical or Mental Harm

The defendants argue that the plaintiffs "do not even suggest that they face 'retaliatory' physical or mental harm by either of the [d]efendants." Defs.' Opp'n at 8 (quoting Qualls, 228 F.R.D. at 12). The defendants further contend that "exaggerated assertions" offered by the plaintiffs "should not be credited by the Court, especially since no affidavit was provided by Jane Does 1 or 3, or any mental-health provider," id. at 9, and that the plaintiffs have offered "nothing to support their claim [as to Jane Does 2, 4, and 5,] that the disclosure of their identities would exacerbate th[eir psychological] 'trauma,'" id.[5] Although the Court agrees with the defendants

---

[5] The defendants rely on Qualls to support these arguments. However, Qualls does not assist the defendants. In Qualls, the district court did not permit the plaintiffs to proceed under pseudonyms because the plaintiff alleged only "fears of embarrassment or vague, unsubstantiated fears of retaliatory actions by higher-ups." Qualls, 228 F.R.D. at 12. Here, the Court finds that the plaintiffs, although they have not offered declarations or affidavits, have alleged more than "fears of embarrassment or vague, unsubstantiated fears of retaliatory actions by higher-ups." Id. In addition, the Court does not agree with the defendants that an affidavit from an expert is necessary for the Court to

(continued . . .)

that the plaintiffs bear the burden to demonstrate a "legitimate basis" for proceeding under pseudonyms, see Defs.' Opp'n at 9; Qualls, 228 F.R.D. at 13, the Court finds that the plaintiffs have demonstrated that this factor weighs in their favor.

A showing of either a risk of retaliatory physical harm or a risk of mental harm weighs in favor of granting a plaintiff anonymity in a proceeding involving allegations of sexual assault. See De Amigos, LLC, 2012 WL 13047579, at *2–4 ("Although there is no indication that [the plaintiff's] identification poses a risk of retaliatory harm, such publicity could exacerbate the psychological harm that she has already experienced[.]").  A plaintiff need not show both a risk of retaliatory physical harm and mental harm—either is sufficient.  See id.  "Courts generally find a risk of retaliatory harm in cases where the moving party provides evidence that psychological damage or violent threats are anticipated if a party's identity is disclosed." J.W. v. District of Columbia, 318 F.R.D. 196, 200 (D.D.C. 2016) (citations omitted).

Here, the Court finds that public disclosure of the plaintiffs' true identities is likely to result in psychological harm.  See Cabrera, 307 F.R.D. at 6 ("A showing of either a risk of retaliatory physical harm or a risk of mental harm weighs in favor of granting a plaintiff anonymity in a proceeding involving allegations of sexual assault." (internal citation omitted)). The plaintiffs have alleged that each Jane Doe has already suffered and continues to suffer depression of varying degrees, anxiety, panic attacks, and social isolation.  See Am. Compl. ¶¶ 36, 45, 70, 82, 92.  Furthermore, the plaintiffs allege that Jane Does 1 and 2 remain fearful that they will encounter their assailant, Pls.' Mem. at 4 (citing Am. Compl. ¶¶ 36, 70), and that Jane Does 3, 4, and 5 continue to remain uncomfortable in the IIEP office and feel their relationships

---

(. . . continued)
find the plaintiffs face a risk of retaliatory physical or mental harm.  See Cabrera, 307 F.R.D. at 7 n.10 ("[E]ven without relying on the affidavit . . . , the Court finds that this factor favors anonymity.").

with their coworkers and supervisors have been impaired, see id. at 4–5. Contrary to the defendants' assertions, the plaintiffs have shown a possibility of psychological harm from having their identity disclosed.

In addition, the Court agrees that "[p]ublic disclosure of [the p]laintiffs' private identities will compound and exacerbate the psychological trauma they have already suffered, especially in the age of the internet." Id. at 5 (citing Cabrera, 307 F.R.D. at 7). Compelling the plaintiffs to identify themselves by name on every court filing would make the plaintiffs' names "indefinitely available to the public," Cabrera, 307 F.R.D. at 6–7, which, "especially in the Internet age, could subject the plaintiff[s] to future unnecessary interrogation, criticism, or psychological trauma," id. Therefore, "[o]ut of grave concern that the Court could exacerbate any psychological issues the plaintiff[s are] currently experiencing, the Court finds that this factor weighs in favor of anonymity." Id. at 7.[6]

### 3. Whether the Plaintiff's Privacy Interests Require the Protection of Pseudonyms in Light of Age

Where victims are not minors, courts are generally less inclined to let the alleged victim proceed in litigation under a pseudonym. See Yaman v. U.S. Dep't of State, 786 F. Supp. 2d 148, 153 (D.D.C. 2011) (citing Doe #1 v. Von Eschenbach, Civ. Action No. 06-2131 (RMC), 2007 WL 1848013, at *2 (D.D.C. June 27, 2007)); see also De Amigos LLC, 2012 WL 13047579, at *2 (recognizing that children are more vulnerable than adults and so children need more protection of their privacy interests). Here, the plaintiffs are not minors, nor were they minors when the alleged incidents occurred. See Am. Compl. ¶¶ 24, 37, 46, 71, 83.

---

[6] Even if the defendants' arguments with respect to this factor are correct, "the Court places less weight on this factor, because [the p]laintiffs have already satisfied the first factor and shown that this case involves a matter of a sensitive and highly personal nature." J.W., 318 F.R.D. at 200–01 (internal quotation marks and citation omitted).

The plaintiffs nevertheless argue that this factor "favors allowing [them] to pursue this lawsuit as Jane Does" because they "have just reached the age of majority, and are young, vulnerable college students." Pls.' Mem. at 5. Furthermore, the plaintiffs allege that "[d]isclosure of their identities could have irreversible harm to their ability to get into graduate schools and their career prospects." Id. And, it is true that "young adult college student[s ]may be more susceptible to scrutiny from peers than an older adult would be." De Amigos LLC, 2012 WL 13047579, at *2. However, while "[a] young person who has attained legal adulthood may have room to grow in maturity, [they] still [have] surpassed the age at which protected status is typically accorded." Sandberg, 319 F. Supp. 3d at 429. As the defendants correctly note, without further evidence, the plaintiffs' positions as to this factor is "pure speculation, and is unsupported by any facts or logic." Defs.' Opp'n at 10. Therefore, this factor does not favor the plaintiffs' use of pseudonyms. See, e.g., Cabrera, 307 F.R.D. at 7 ("Where victims are not minors, courts are generally less inclined to let the alleged victim proceed in litigation under a pseudonym."); Yaman, 786 F. Supp. 2d at 153 (concluding that a court is more likely to allow pseudonymous litigation when it involves the privacy interests of minor children).

### 4. Whether the Action is Against a Governmental or a Private Party

In assessing whether pseudonymous litigation is appropriate, courts should also consider whether an accused defendant is a governmental entity or a private party. This consideration is "significant because governmental bodies do not share the concerns about reputation that private individuals have when they are publicly charged with wrongdoing." De Amigos LLC, 2012 WL 13047579, at *3 (internal quotation marks and citation omitted); see also Yaman, 786 F. Supp. 2d at 153 (finding action brought against private party weighs against anonymity). This factor weighs against allowing the plaintiffs to use pseudonyms because the defendants are private litigants, who presumably have concerns about their respective reputations.

The plaintiffs concede that "this factor may not support [their] use of pseudonyms." Pls.'

Mem. at 5–6. Nevertheless, they claim that GW "is the second largest employer in the District of

Columbia" and that "GW is current[ly] being investigated by the Department of Education for

Title IX violations, such as those alleged in this case." Id. And for these reasons, they argue that

"given its size as an institution and the mere facts that it is already under investigation for Title

IX violations," there is a "lesser concern that its reputation will be damaged." Id. at 6. The

Court is not persuaded by these arguments. Neither GW's size, nor any other investigations that

may be taking place impact the potential for reputational damage from this litigation. Therefore,

this factor also weighs against the plaintiffs' use of pseudonyms.

### 5. Whether Permitting the Use of Pseudonyms is Unfair to the Defendants

"Courts generally find little to no risk of unfairness to an accused defendant in sexual

assault cases where discovery does not appear to be inhibited by the plaintiff's desire to proceed

anonymously." Cabrera, 307 F.R.D. at 8 (collecting cases). The defendants argue that this

factor "strongly supports the [d]efendants' position because of the public statements of [the

p]laintiffs' counsel."[7] Defs.' Opp'n at 10. The defendants claim that allowing the plaintiffs to

proceed pseudonymously will make "witnesses [ ] likely to be reluctant to come forward . . . to

testify truthfully in ways that support the defendants[,]" id. at 11, and that they will be

"prejudiced . . . to the extent that [the d]efendants are limited in using [the p]laintiffs' actual

names in third-party subpoenas, depositions, and interviews," id. "But this is nothing more than

conjecture at best." Cabrera, 307 F.R.D. at 8.

---

[7] The defendants also argue that this factor supports their position because of the shrill content and vilification in the Amended Complaint. Defs.' Opp'n at 10. However, because the defendants do not sufficiently support this argument with legal authority, the Court cannot conclude that the defendants are entitled to a favorable finding on that basis.

The Court concludes that this factor weighs in favor of anonymity because it would not be unfair to the defendants if the plaintiffs continued under pseudonyms for pretrial purposes. The identities of the plaintiffs are already known to the defendants from the plaintiffs' reports to Renner, the ODECE, and other GW employees. See Am. Compl. ¶¶ 58, 97, 99, 101, 103, 107, 110, 113. Furthermore, the defendants would not be prejudiced during discovery. See De Amigos LLC, 2012 WL 13047579, at *3 (finding any unfairness in conducting third-party discovery "minimal" to the defendant where the plaintiff "already disclosed her identity" to the defendant). The defendants have already started to conduct discovery and have collected email correspondence involving two of the Jane Does. See Defs.' 2d Mem., Exhibit ("Ex.") A (Email from Jane Doe 3 to GW's Title IX office); id., Ex. B (Email from Jane Doe 3 to Director Chen); id., Ex.C (Email from a Title IX Investigator to a Jane Doe).

The defendants rely on this Court's decision in Cabrera in support of their argument. As the defendants correctly state, this Court in Cabrera was not dissuaded from permitting the plaintiff to proceed anonymously by "the concerns of unfair publicity . . . because (1) the defendant's counsel publicly responded to the allegations, and (2) the plaintiff had not 'shared' the details of the assault with more than "'a few close friends and family members.'" Defs.' Opp'n at 11 (quoting Cabrera, 307 F.R.D. at 9 n.14). As an initial matter, as in Cabrera, the Court is "deeply concerned and troubled by the public statement made by the plaintiff[s' counsel]—presumably with the plaintiff[s'] consent—to the media after the plaintiff[s] filed the complaint." Cabrera, 307 F.R.D. at 9. And, the defendants suggest that the absence of the two "elements" found to be convincing in Cabrera should dissuade the Court from permitting the plaintiffs to proceed anonymously. However, the defendants' reliance on Cabrera to support this argument is misguided because, contrary to their suggestion, both "elements" exist in the present

case. Although the "[d]efendants' counsel has made no public comments," Defs.' Opp'n at 11, the defendants themselves have responded in the media, see Defs.' Opp'n, Ex. A (Washington Post article); id. Ex. B (Washington Post article and three anonymous comments); id., Ex. C (GW Hatchet article). The Court finds that by their statements to the media, the defendants have vitiated their right to claim media coverage as unfairly prejudicial. In addition, the defendants argue that unlike the plaintiff in Cabrera, who told no one about the assault "[a]side from a very few close friends and family members," Cabrera, 307 F.R.D. at 9 n.14, the plaintiffs here have "freely shared their allegations with a group of eleven co-workers," Defs.' Opp'n at 11. However, the "extent of [these] disclosures does not reel in the public at large, and these disclosures . . . were necessary to help [the plaintiffs] cope and move on." Cabrera, 307 F.R.D. at 9 n.14 (citation omitted). Therefore, like in Cabrera, the Court is not dissuaded from permitting the plaintiffs in this case to proceed anonymously because despite the media coverage, the plaintiffs' identities have not been revealed to the public by the media. Accordingly, "the [plaintiffs'] interest[s] in maintaining [their] anonymity remains a valid concern. Id. at 9. Because the defendants have not demonstrated that they will be prejudiced at this stage of the litigation by permitting the plaintiffs to proceed anonymously, this factor weighs in favor of allowing the Plaintiffs to proceed under the pseudonyms of Jane Does 1 to 5.

Accordingly, considering the sensitive and highly personal nature of this case; the risk of psychological harm to the plaintiffs if the plaintiffs' names are made public; and the minimal, if any, unfairness that the plaintiffs' anonymity would cause the defendants, the Court finds that the plaintiffs have demonstrated a legitimate basis for proceeding anonymously and will permit the five plaintiffs to proceed under the pseudonyms Jane Does 1 to 5 throughout the pretrial stages of this case. However, "if [ ] a trial is ultimately needed to resolve th[e] dispute[s in this case], then

the defendant[s'] ability to receive a fair trial will likely be compromised if the Court allows the plaintiff[s] to continue using [] pseudonym[s]."[8] <u>Cabrera</u>, 307 F.R.D. at 10 (footnote omitted) (citation omitted).  Therefore, "if this case proceeds to trial, the plaintiff[s] will not be allowed to use [ ] pseudonym[s]."[9] <u>Id.</u> at 10 (citation omitted).   Because the Court concludes that the plaintiffs may proceed at this time under the pseudonyms Jane Does 1 to 5, the Court denies as moot the defendants' motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and turns to the defendants' Rule 12(b)(6) motion.

**B.      The Defendants' Motion to Dismiss**

**1.   Count I – Hostile Work Environment in Violation of the D.C. Human Rights Act**

The defendants move to dismiss the hostile work environment claims of only Jane Does 1 and 3, arguing that the plaintiffs' allegations do not rise to the level of extreme conduct necessary for viable hostile work environment claims.  <u>See</u> Defs.' 2d Mem. at 17–21.[10]  The Court disagrees and finds that the plaintiffs have pleaded sufficient allegations from which the Court can plausibly infer that Jane Does 1 and 3 were subjected to a hostile work environment.

---

[8] The Court's reason for this position is that permitting parties to proceed to trial with the use of pseudonyms potentially conveys overtly, or at least subliminally, the Court's perception that significant harm has been sustained in requiring the concealment of the plaintiffs' true identities.  And because the Court cannot in any way suggest to a jury that it favors one side over the other, the possible advantage obtained through judicially authorized use of pseudonyms cannot be condoned.

[9] The Court emphasizes that granting the plaintiffs' motion is necessarily a preliminary determination, requiring the Court to make the decision based on the plaintiffs' allegations and submissions to the Court.  This ruling should not be read to suggest that the Court may not reverse its position on anonymity should circumstances change, warranting a different result.  In that regard, counsel and the parties themselves should appreciate that the Court will not tolerate attempts to gain an advantage through the use of the media, including social media.  Therefore, should the parties, their counsel, or others acting on their behalf, cause further unnecessary dissemination of public comment about this case, the Court's position on the plaintiffs' anonymity, both at the pretrial and trial stages, may change.

[10] The defendants do not dispute whether the plaintiffs have sufficiently pleaded the remaining elements of a hostile work environment claim.  <u>See generally</u> Defs.' 2d Mem. at 15–21.  Therefore, the Court will address only the defendants' argument regarding the fourth element of a hostile work environment claim—whether the alleged conduct was severe and pervasive.

To establish a <u>prima facie</u> case for a hostile work environment claim, a plaintiff must show:

> (1) that [s]he is a member of a protected class, (2) that [s]he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.

<u>Campbell-Crane & Assocs., Inc. v. Stamenkovic</u>, 44 A.3d 924, 933 (D.C. 2012) (quoting <u>Daka, Inc. v. Breiner</u>, 711 A.2d 86, 92 (D.C. 1998)).[11] "When an employee sues an employer under the [D.C. Human Rights Act] for the discriminatory actions of a fellow employee, the plaintiff-employee must also present sufficient proof to hold the employer liable under the doctrine of <u>respondeat superior</u>." <u>Daka</u>, 711 A.2d at 92 n.15 (citing <u>Howard Univ. v. Best</u>, 484 A.2d 958, 982–83 (D.C. 1984)). "Although a plaintiff need not plead a <u>prima facie</u> case of hostile work environment in the complaint, the 'alleged facts must support such a claim.'" <u>McKeithan v. Boarman</u>, 803 F. Supp. 2d 63, 69 (D.D.C. 2011) (quoting <u>Middlebrooks v. Godwin Corp.</u>, 722 F. Supp. 2d 82, 90–91 & n.6 (D.D.C. 2010)). In order to defeat a Rule 12(b)(6) motion, the plaintiffs are "not required to allege each element of their claim in their Complaint," <u>Tucker v. Howard Univ. Hosp.</u>, 764 F. Supp. 2d 1, 9–10 (D.D.C. 2011), but rather are required to "plead factual content" that would allow the Court "to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged," <u>Iqbal</u>, 556 U.S. at 678.

A work environment is considered "hostile" only when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Oncale v.</u>

---

[11] In deciding the plaintiffs' claims arising under the D.C. Human Rights Act, the Court, at times, will rely upon decisions of the federal courts in Title VII cases because it is well-established that the D.C. Human Rights Act and Title VII claims are analyzed using the same legal standards. <u>See e.g.</u>, <u>Elhusseini v. Compass Grp. USA, Inc.</u>, 578 F. Supp. 2d 6, 10 n.4 (D.D.C. 2008) (collecting cases).

Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (internal quotation marks omitted) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  In determining whether a work environment is sufficiently "hostile," the Court must look at the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris, 510 U.S. at 23.

In support of their argument for dismissal, the defendants cite a number of cases from this district, but those cases are either legally or factually inapposite.  The defendants chiefly rely on Tucker v. Johnson, 211 F. Supp. 3d 95 (D.D.C. 2016); Kennedy v. Nat'l R.R. Passenger Corp., 139 F. Supp. 3d 48 (D.D.C. 2015); Lancaster v. Vance-Cooks, 967 F. Supp. 2d 375 (D.D.C. 2013); Bergbauer v. Mabus, 934 F. Supp. 2d 55 (D.D.C. 2013); Akonji v. Unity Healthcare, Inc., 517 F. Supp. 2d 83 (D.D.C. 2007); and Carter v. Greenspan, 304 F. Supp. 2d 13, 25 (D.D.C. 2004), to support their claim that "[f]ar worse allegations have been found insufficient to state a hostile-environment claim," see Defs.' 2d Mem. at 17–18.  However, the defendants ignore a critical difference between the appropriate standards governing motions to dismiss and motions for summary judgment that courts are required to apply in evaluating whether an alleged hostile work environment falls within the scope of the D.C. Human Rights Act.  In fact, the district courts in some of the cases cited by the defendants were not deciding motions to dismiss—which only require that factual allegations be plausible such that they raise the "right to relief above the speculative level," Twombly, 550 U.S. at 555, but rather were resolving motions for summary judgement, see Tucker, 211 F. Supp. 3d at 98–99; Kennedy, 139 F. Supp. 3d at 56; Bergbauer, 934 F. Supp. 2d at 68; Akonji, 517 F. Supp. 2d at 89; see also Lancaster, 967 F. Supp. 2d at 379 (applying motion for summary judgment standard although the defendant moved to dismiss, or in

the alternative, for summary judgment); <u>Carter</u>, 304 F. Supp. 2d at 17 (same), which are granted

only "if the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. 242, 247 (1986). The remaining cases cited by the defendants as exemplars of

hostile work environment claims that have been dismissed at the motion to dismiss stage are

factually inapposite to this case.[12] The Court agrees with the plaintiffs that those cases were

dismissed because they "did not allege a specific, severe, and pervasive hostile work

environment," Pls.' Opp'n at 11, but instead "relied on vagaries, insinuations, and circumstances

that fell well below the allegations made by Jane Doe[] 1," <u>id.</u> Here, in reviewing the totality of

the circumstances, the Court finds that the plaintiffs, at the motion to dismiss stage, have

satisfied their burden that the alleged conduct was sufficiently severe and pervasive such that it

created a hostile work environment. <u>Cf.</u> <u>Holmes–Martin v. Leavitt</u>, 569 F. Supp. 184, 193

(D.D.C. 2008) (denying motion to dismiss hostile-work-environment claim because the plaintiff

---

[12] <u>See e.g.</u>, <u>Walden v. Patient-Centered Outcomes Research Inst.</u>, 177 F. Supp. 3d 336, 344–45 (D.D.C. 2016) (finding that merely receiving a negative performance evaluation, being assigned to a performance improvement plan, receiving an increased workload, missing physical therapy, and getting paid-time off were insufficient to allege the extreme conduct required to state hostile work environment claim under the D.C. Human Rights Act); <u>McCaskill v. Gallaudet Univ.</u>, 36 F. Supp. 3d 145, 156 (D.D.C. 2014) (concluding that "one confrontation with a coworker, unspecified 'abuse' at meetings, and one threatening letter from a faculty member (about which nothing more is alleged)" did not support the plaintiff's contention that she was subjected to conduct "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." (citation omitted)); <u>Munro v. LaHood</u>, 839 F. Supp. 2d 354, 365–66 (D.D.C. 2012) (holding that the plaintiff's allegations that he was "yelled at," placed on a performance improvement plan, received unfavorable feedback, told he could not submit any more assignments, and placed on a performance opportunity period were not "sufficient to establish that these acts were severe or pervasive enough to constitute a hostile work environment"); <u>Nurriddin v. Bolden</u>, 674 F. Supp. 2d 64, 93–95 (D.D.C. 2009) (finding that allegations that management "passed him over for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks about his EEO complaints, closely scrutinized his work, refused him a window cubicle, removed some of his duties, [ ] denied his requests to travel or otherwise failed to provide support for his work with staffing and funding[,] . . . opposed his career advancement[,] . . . denied many of his leave requests[,] and engaged in a series of discussions to end his eligibility for workers' compensation and to terminate his employment at NASA" did not amount to "intimidation, ridicule and insult, that is sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment" (citations omitted)).

"alleged some conduct in support of her claim" and noting that the plaintiff must plead facts that "support," not "establish," that claim)

With respect to Jane Doe 1,[13] the Amended Complaint alleges several instances of harassment based on her gender by Jones and Renner within a seven-month period.[14] First, it states that in October 2017, Jones texted Jane Doe 1 at 2:18 a.m., stating, "oh my god you're so hot." Am. Compl. ¶ 48. Jones thereafter allegedly invited Jane Doe 1 to come to his house and after she declined, purportedly stated "maybe we could go out another time." Id. ¶ 49. Second, the Amended Complaint asserts that in December 2017 Jones attended Jane Doe 1's performance "over [her] protestations that he not," id. ¶ 53, and then "again asked Jane Doe 1 on a date," a request that she also declined, id. ¶ 54. Third, it claims that Jones "openly discussed his sexual exploits in the workplace." Id. ¶ 64. The Amended Complaint also alleges that Renner, on multiple occasions, "touch[ed] the small of Jane Doe 1's back . . . without her permission," id. ¶ 61, and that the "touch was sexual and inappropriate," id. Assuming the truth of the plaintiffs'

---

[13] "The scope of [the] plaintiff[s'] hostile work environment claim based on gender . . . exclude[s] claims that bear no correlation to [the] plaintiff[s'] gender." Whorton v. Washington Metro. Area Transit Auth., 924 F. Supp. 2d 334, 350 (D.D.C. 2013). Therefore, because, as framed in the Amended Complaint, the plaintiffs' allegation that "[f]ollowing [Jane Doe 1's] initial complaint to Renner, Jones intentionally increased his hostility toward[] her," Am. Compl. ¶ 66, by "treating [her] with hostility and harass[ing] her as she quietly did her work," id., and by "disparag[ing] Jane Doe 1 to her supervisor," id., have not in any way been tied to Jane Doe 1's gender, the Court will exclude the consideration of such allegation from Jane Doe 1's hostile work environment claim based on her gender. The Court will address this allegation, however, as part of Jane Doe 1's retaliation claim based on a hostile work environment, infra.

[14] The Court generally agrees with the defendants that comments made by Jones or Renner "outside Jane Doe 1's presence, or directed at others, do not support a hostile-environment claim." Defs.' 2d Mem. at 21; see also Clemmons v. Acad. for Educ. Dev., 107 F. Supp. 3d 100, 117 (D.D.C. 2015) (Although "second-hand gossip may be . . . unpleasant to hear, [ ] it lacks the severity or pervasiveness necessary to affect the terms or conditions of employment and to give rise to an environment that is subjectively and objectively hostile."); Rattigan v. Gonzales, 503 F. Supp. 2d 56, 78–81 (D.D.C. 2007) (holding that comments made outside the plaintiff's presence did not give rise to an actionable hostile work environment); Nurriddin v. Goldin, 382 F. Supp. 2d 79, 108 (D.D.C. 2005) ("When [ ] statements are not made directly to a plaintiff, generally a hostile environment cannot be established.") aff'd sub nom. Nurriddin v. Griffin, 222 F. App'x 5, 5–6 (D.C. Cir. 2007); Lester v. Natsios, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) ("Conduct directed at others rather than at [the] plaintiff . . . is less indicative of a hostile work environment."). However, even if the Court does not consider the allegations regarding what Jane Doe 1 experienced second-hand, the Court nonetheless finds that the plaintiffs' remaining allegations with respect to Jane Doe 1's hostile work environment claim—which must be accepted as true—rise to the level of severe and pervasive treatment sufficient to alter the conditions of Jane Doe 1's employment.

allegations and viewing them in the light most favorable to the plaintiffs as the Court is required

to do, the Court finds that these allegations plausibly support Jane Doe 1's claim that Jones's and

Renner's conduct was "sufficiently severe or pervasive to alter the conditions of the [Jane Doe

1's] employment and create[d] an abusive working environment." Harris, 510 U.S. at 21

(internal quotation marks and citation omitted). Accordingly, the Court declines to dismiss Jane

Doe 1's hostile work environment claim at this stage of the proceedings.

With respect to Jane Doe 3, the Amended Complaint alleges that Renner subjected Jane

Doe 3 to a hostile work environment by (1) touching her "arm or shoulder," Am. Compl. ¶ 73;

(2) "frequently [ ] reach[ing] over [ ] [her] to type on her keyboard while she remain[ed] seated,"

id.; (3) "routinely comment[ing] on [ ] [her] clothing," id.; (4) dismissing "Jane Doe 3's

recommendations in front of the staff" and instead "gave preferential treatment to [her male] co-

team leader," id. ¶ 75; and (5) on one occasion, asking "Jane Doe 3 when she intended to get

married and have kids," id. ¶ 76.[15]  While the Court notes that these allegations are concededly

neither specific nor severe, the plaintiffs allege a series of incidents that, considered together and

accepted as true, are "sufficiently continuous and concerted to be considered pervasive." Akonji,

517 F. Supp. 2d at 98 (citing Carrero v. N.Y.C. Housing Auth., 890 F.2d 569, 577 (2d Cir.

1989)); see also Burrell v. Shepard, 321 F. Supp. 3d 1, 13 (D.D.C. 2018).  Therefore, the Court

concludes that Renner's conduct was sufficiently pervasive to produce a "constructive alteration

in the terms or conditions of [Jane Doe 3's] employment," Burlington Indus., Inc. v. Ellerth, 524

U.S. 742, 752 (1998); see also Brooks v. Grundmann, 748 F.3d 1273, 1276 (D.C. Cir. 2014)

(explaining that severity and pervasiveness "are complementary factors and often go hand-in-

hand, but a hostile work environment claim c[an] be satisfied with one or the other").

---

[15] For the reasons already discussed above, the Court will only consider the allegations that Jane Doe 3 experienced first-hand and those that are sufficiently tied to Jane Doe 3's gender.

Accordingly, the Court must deny the defendants' motion to dismiss with respect to Jane Doe 3's hostile work environment claim as well.

**2. Count II – Retaliation in Violation of the D.C. Human Rights Act**

The D.C. Human Rights Act provides:

> It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.

D.C. Code § 2-1402.61(a). To establish a prima facie case of retaliation under the D.C. statute, a plaintiff must show "(1) that [s]he engaged in a statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two." Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009). As another member of this Court has explained:

> [T]here is a difference between "adverse actions" that support a claim for discrimination and "materially adverse actions" that support a claim for retaliation. Unlike discriminatory actions, retaliatory actions need not be employment-related or even occur in the workplace, nor must they result in "a materially adverse change in the terms or conditions of one's employment." Nonetheless, the alleged retaliatory action must produce "an injury or harm." The injury or harm must be "material," meaning that it could "dissuade a reasonable worker from making or supporting a charge of discrimination."

Nurriddin v. Bolden, 40 F. Supp. 3d 104, 116, 2014 WL 1648517, at *6 (D.D.C. 2014) (internal alterations and citations omitted); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). Although actions that result in objectively tangible harm are certainly more likely to dissuade a reasonable worker from pursuing a claim than "petty slights, minor annoyances, and simple lack of good manners," Burlington N., 548 U.S. at 68, "the significance of any given act of retaliation," and therefore its potential to deter discrimination complaints, "will often depend upon the particular circumstances," id. at 69. Thus, under certain circumstances, an

action may be materially adverse even if no tangible harm results.  See Mogenhan v. Napolitano, 613 F.3d 1162, 1165–66 (D.C. Cir. 2010) (applying Title VII retaliation claim standard to an Americans with Disabilities Act claim).

To establish a causal connection between the engagement in a protected activity and the retaliatory action—in the absence of direct evidence—a plaintiff may show "that the employer had knowledge of the employee's protected activity, and that the discriminatory [or retaliatory] personnel action took place shortly after that activity."  Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000).  While mere temporal proximity between an employee's protected activity and the retaliatory action can sometimes raise an inference of causation, such proximity must be "very close."  Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268 (2001) (noting that the temporal connection must be "very close": a three- or four-month period between an adverse action and protected activity is insufficient to show a causal connection, and a twenty-month period suggests "no causality at all").  Although "neither the Supreme Court nor the [this Circuit] has established a bright-line three-month rule," Hamilton v. Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012), this Circuit has found that such a gap between the protected activity and the adverse employment action negates the temporal proximity needed to prove causation, see Taylor v. Solis, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (rejecting interval of two and a half months as establishing temporal proximity "on the record [in this case]").

Although the Amended Complaint contains only one count of retaliation, within that count, the plaintiffs allege that they suffered four discrete acts of retaliation, see Am. Compl. ¶ 123 ("[The d]efendants retaliated against [the p]laintiffs by forcing them to work from home, disciplining them, reducing their hours, and terminating them from their employment with GW."), and also that they were subjected to a hostile work environment as retaliation for

engaging in protected activity,[16] see id. ¶ 124 (alleging that "[t]he harassing, reckless, wrongful, willful[,] and malicious treatment of the [p]laintiffs . . . is retaliation with[in] the meaning of the D.C. Human Rights Act.").  The defendants challenge the plaintiffs' retaliation claims on the basis that the alleged actions do not constitute materially adverse actions.  Defs.' 2d Mem. at 23–28.  Because "each retaliatory adverse [ ] decision constitutes a separate actionable 'unlawful employment practice,'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002), the Court will analyze each alleged act of retaliation in turn to determine whether any of the acts amounts to a materially adverse action sufficient to state a retaliation claim.

### a.     Requests for the Plaintiffs to Work from Home

The plaintiffs assert that during their March 9, 2018 meeting with Renner regarding Jones's behavior, Renner "asked the [p]laintiffs to work from home," Am. Compl. ¶ 107, which they contend constituted retaliation, see Pls.' Opp'n at 18–20, 23.  The defendants argue in response that "even if [the plaintiffs] had been required to work from home temporarily . . . , that would not be . . . a 'materially adverse action,' given that there is no allegation that the [p]laintiffs' duties, compensation, or benefits would have changed in any way."[17]  Defs.' 2d Mem. at 23 (citations omitted).  The Court agrees with the defendants that asking an employee to

---

[16] The plaintiffs contend that the defendants' "retaliation against the [p]laintiffs has continued since the filing of this lawsuit," Pls.' Opp'n at 26, because the "[d]efendants are opposing [the p]laintiffs' efforts to proceed anonymously in this lawsuit," id.  However, this argument has no merit because the defendants' filing a motion to dismiss and opposition of the plaintiffs' motion for leave to proceed anonymously can be attributed to a "legitimate non-discriminatory reason for its actions"—exercising their rights pursuant to the Federal Rules of Civil Procedure and this Court's Local Rules to file a motion to dismiss and an opposition to any motions filed by the plaintiffs.  See Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  "Such a legitimate reason breaks the causal connection between the first two elements" and defeats any retaliation claim that the plaintiffs are suggesting.  Peters v. District of Columbia, 873 F. Supp. 2d 158, 201 (D.D.C. 2012).

[17] The Court notes that the plaintiffs need not allege, as the defendants suggest, that the plaintiffs' "duties, compensation, or benefits would have changed in any way."  Defs.' 2d Mem. at 23.  "The concept of 'adverse action' in the retaliation context is broader than in the discrimination context and can encompass harms unrelated to employment or the workplace 'so long as "a reasonable employee would have found the challenged action materially adverse."'"  Franklin v. Potter, 600 F. Supp. 2d 38, 66 (D.D.C. 2009) (quoting Burlington N., 548 U.S. at 68).

work from home—without more—is not an adverse action per se.[18]  See id. at 23; cf. Hornsby v. Watt, 217 F. Supp. 3d 58, 66–67 (D.D.C. 2016) (holding that "the decision not to reinstate [the p]laintiff from paid administrative leave immediately . . . was not a materially adverse action because it did not cause him any objectively tangible harm"); Walker v. Johnson, 501 F. Supp. 2d 156, 172 (D.D.C. 2007) (finding that being sent home on paid administrative leave is not an adverse action because the plaintiff could not show objectively tangible harm resulting from the paid leave); see also Franklin v. Potter, 600 F. Supp. 2d 38, 72 (D.D.C. 2009) (finding that "being sent home without pay . . . would satisfy a prima facie case for a materially adverse action").

The plaintiffs have alleged no "objectively tangible harm" that they specifically suffered by being requested to work from home.[19]  Cf. Hornsby, 217 F. Supp. 3d at 67 ("Because a period of paid administrative leave does not, in and of itself, constitute a materially adverse action, [the p]laintiff must allege specific, additional facts from which the Court could infer that this short extension of his paid administrative leave caused him objectively tangible harm.").  Without more, the Court cannot conclude that a "reasonable employee would have found the challenged action materially adverse."  Id. at 68.  Accordingly, the Court concludes that the request for the plaintiffs to work from home does not rise to the level of an adverse employment action as

---

[18] The plaintiffs claim that "the forced relocation is by itself a material adverse action."  Pls.' Opp'n at 20 (citing Loya v. Sebelius, 840 F. Supp. 245, 253 (D.D.C. 2012)).  However, in addition to the record not supporting their characterization that they were forced to work from home, the plaintiffs, unlike the plaintiff in Loya, fail to allege how being asked to work from home injured them.

[19] Although, with respect to Jane Doe 1, the plaintiffs argue in their opposition to the motion to dismiss that "[f]orcing Jane Doe 1 to work from home . . . was a materially adverse employment action" because it "isolated her from her coworkers, interfered with the performance of her job responsibilities, and reflected poorly on her job performance with her faculties supervisors," Pls.' Opp'n at 19 (citing Am. Compl. ¶ 70), they fail to allege in their Amended Complaint that these harms were specifically caused by Renner's request that Jane Doe 1 work from home, which is fatal to Jane Doe 1's claim, see St. Francis Xavier Parochial Sch., 117 F.3d at 624 (noting that the Court, in ruling on a Rule 12(b)(6) motion to dismiss, "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice.").

contemplated by the D.C. Human Rights Act because they fail to allege any facts supporting the inference that this request resulted in any objectively tangible harm.  Therefore, the Court must grant the defendants' motion to dismiss the plaintiffs' retaliation claim based on Renner's request that the plaintiffs work from home.

### b.	Disciplinary Action

The defendants also argue that the plaintiffs do not allege that they were ever actually disciplined.  See Defs.' 2d Mem. at 23–28.  The plaintiffs do not specifically identify the actions that they view as the retaliatory disciplinary actions taken against them by the defendants; however, they do argue in their opposition that a number of Renner's statements that "attempted to discourage Jane Doe 3 and the [p]laintiffs from pursuing their complaints of harassment," Am. Compl. ¶ 112, were materially adverse, see Pls.' Opp'n at 18, 21, 25.  Although it is unclear whether the plaintiffs view these statements as the retaliatory disciplinary actions taken against them, the Court will construe them as such and address each alleged statement in turn.

First, the plaintiffs allege that on December 19, 2017, after Jane Doe 1 filed a complaint with Renner about "Jones'[s] behavior toward her[,] . . . Renner responded, 'sometimes you need to work with people that you don't necessarily get along with.'"  Am. Compl. ¶ 58.  This statement, which was allegedly made by Renner, an individual in a supervisory position, in response to Jane Doe 1 divulging that "she felt unsafe working with Jones," id., was not only insensitive but also dismissive and would dissuade a reasonable person who was experiencing sexually harassing behavior from complaining again.  Consequently, the Court concludes that, in light of the circumstances in which it was made, a reasonable jury could infer that this statement suffices to show that Jane Doe 1 suffered an adverse employment action.  See Burlington N., 548 U.S. at 69 ("[T]he significance of any given act of retaliation will often depend upon the

particular circumstances. Context matters."); see also Oncale, 523 U.S. at 81–82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships[.]").

Second, the plaintiffs allege that on February 23, 2018, during a meeting with Jane Doe 2, "Renner told [her] that to 'follow-up' on her complaint about Jones, there was nothing [he] could do because his 'hands were tied.'" Am. Compl. ¶ 101. The plaintiffs represent that Jane Doe 2 requested that Renner fire Jones, but Renner allegedly repeatedly responded that his "hands were tied" and that she "should work from home and go to therapy." Id. Although Renner's purported instruction that Jane Doe 2 "go to therapy," id., is analogous to receiving a "counseling letter," which this Circuit has found insufficient to constitute an adverse employment action if it contains "no abusive language, but rather job-related constructive criticism," Baloch v. Kempthorne, 550 F.3d 1191, 1199 (D.C. Cir. 2008), the circumstances in this case require a different outcome. Renner's statement in response to Jane Doe 2 complaining that "she had to work beside the man [who] raped her," Am. Compl. ¶ 101, was not constructive in any manner, but rather, as the plaintiffs argue, "demeaning, insulting, and ridiculing," Pls.' Opp'n at 21. As a result, the Court finds that this statement, at the motion to dismiss stage, is sufficient to support an inference that the statement would deter a reasonable person from complaining of discrimination.

Third, the plaintiffs allege that on March 30, 2018, Renner told Jane Doe 3 that the plaintiffs were "spreading misinformation" and "making the situation worse." Am. Compl. ¶ 112. The plaintiffs argue that Renner's response of "accus[ing] the [p]laintiffs," Pls.' Opp'n at 25, "discouraged [them] from pursuing their complaints of harassment," id. The Court agrees with the plaintiffs and concludes that they have sufficiently pleaded that Renner's accusatory

response could dissuade a reasonable person from complaining of discrimination. However, because the plaintiffs do not allege that Jane Does 1, 2, 4, or 5 had knowledge of Renner's statement to Jane Doe 3 that the plaintiffs were "spreading misinformation" and "making the situation worse," Am. Compl. ¶ 112, the Court finds that these statements can be considered to have been a materially adverse action only with respect to Jane Doe 3, who was the only plaintiff with knowledge of Renner's statements. See id.

Lastly, the plaintiffs argue that "GW retaliated against Jane Doe 4 by trying to silence her," Pls.' Opp'n at 25 (citing Am. Compl. ¶ 4), and that Renner ignored Jane Doe 5's complaints of "being raped by Jones, harassed, and ridiculed in the workplace, . . . and silenced the female complainants," Pls.' Opp'n at 25 (citing Am. Compl. ¶ 92). However, the plaintiffs fail to allege specific facts regarding how Renner specifically attempted to silence Jane Does 4 and 5. Instead, the Amended Complaint makes broad conclusory allegations that the defendants attempted to silence the plaintiffs, see Am. Compl. ¶ 4 ("GW retaliated against the [p]laintiffs for complaining of the sexually hostile workplace and attempted to silence them"), and "the female complainants,"[20] Am. Compl. ¶ 91 ("IIEP staff members have complained about Jones to Renner since March 2017, but Renner ignored those complaints and silenced the female complainants."). Therefore, because the plaintiffs have failed to sufficiently plead facts in the Amended Complaint that support the claim that Renner attempted to silence Jane Does 4 and 5, the Court concludes that the allegation that the defendants disciplined Jane Does 4 and 5 in retaliation for lodging complaints against Jones cannot form the basis of a retaliation claim. Accordingly, the

---

[20] It is unclear from the Amended Complaint whether "female complainants" refers to the plaintiffs or to women other than the plaintiffs. However, even if the Court construes all reasonable inferences in the light most favorable to the plaintiffs, as it must, this allegation would nevertheless be insufficient to support the claims of Jane Does 4 and 5 because it fails to show how Renner specifically attempted to silence them.

Court must grant the defendants' motion to dismiss the retaliation claims of Jane Does 4 and 5 that the defendants disciplined them in retaliation for complaining about Jones's behavior.

### c. Reduction of Hours

The defendants also move to dismiss the plaintiffs' claim that the defendants retaliated against the plaintiffs for filing complaints against Jones by reducing their hours of work. See Defs.' 2d Mem. at 23–28. As an initial matter, the plaintiffs do not allege any facts that would support their claim that the hours of Jane Does 2, 4, and 5 were actually reduced. Therefore, the Court grants the defendants' motion to dismiss the retaliation claims of Jane Does 2, 4, and 5 based on the allegation that the defendants reduced their hours and addresses only the plaintiffs' retaliation claims pertaining to Jane Does 1 and 3 as to this specific alleged adverse action. With respect to Jane Doe 1, the plaintiffs allege that "[f]ollowing [Jane Doe 1's] initial complaint to Renner, Jones deliberately and intentionally increased his hostility" toward Jane Doe 1 and "disparaged [her] to her supervisor, . . . [who] told her that she was not allowed to work the event that evening even though the event was understaffed," Am. Compl. ¶ 66, and that "[t]his was all in retaliation for Jane Doe 1's complaint to Renner,"[21] id. The defendants argue that this allegation is "insufficient to support [Jane Doe 1's] retaliation claim," Defs.' 2d Mem. at 25, because the reason Jane Doe 1 was told that "she was not allowed to work the event that evening even though the event was understaffed," Am. Compl. ¶ 66, was "Jones'[s] disparagement on February 1, 2018, and not Jane Doe 1's prior report to [ ] Renner on December 19, 2017 of [ ] Jones'[s] alleged misconduct," id. The Court disagrees with the defendants that "the [Amended]

---

[21] The defendants argue that the allegation that "[t]his was all in retaliation for Jane Doe 1's complaint to Renner," Am. Compl. ¶ 66, "contradicts the earlier part of the paragraph (attributing the change to [ ] Jones'[s] disparagement), and is a conclusory, 'threadbare' allegation that is insufficient to support the retaliation claim," Defs.' 2d Mem. at 25 n.10 (citation omitted). However, the plaintiffs' legal conclusion is supported by its preceding factual allegations, of which the Court assumes the veracity, as it must, and determines that they plausibly give rise to an entitlement to relief. See Iqbal, 556 U.S. at 679.

Complaint itself indicates that [the] retaliation was not the 'but for' cause of the work assignment."[22]  Defs.' 2d Mem. at 25.  Construing, as it must, all reasonable inferences in the light most favorable to the plaintiffs, the Court finds that these allegations are sufficiently plausible to establish that Jane Doe 1 suffered an adverse employment action when Renner did not allow Jane Doe 1 to work the evening event.[23]  See Burlington N., 548 U.S. at 72.

With respect to Jane Doe 3, the defendants argue that although she alleges that she chose to "cut back significantly on her hours," Am. Compl. ¶ 81, she "does not allege that the [d]efendants required or asked her to do so," Defs.' 2d Mem. at 23.  The Court agrees with the defendants.  The plaintiffs allege that "the work environment grew more hostile for Jane Doe 3 after she became an advocate for the other female workers," Pls.' Opp'n at 24 (citing Am. Compl. ¶ 81), and "[a]s a result, she significantly cut back her hours at the office, which adversely affected her work performance as she was unable to interact with her team directly or her faculty supervisor and prevented her from performing her job duties, thereby impacting the terms and conditions of her employment," id. (internal quotation marks and citation omitted).  Based on these allegations, the defendants are correct that Jane Doe 3, by independently reducing the hours she decided to work, did not suffer a "materially adverse action by h[er] employer." Jones, 557 F.3d at 677 (emphasis added).  Accordingly, with respect to Jane Doe 3, the plaintiffs

---

[22] The Court also disagrees with the defendants that "the [Amended] Complaint alleges that an unnamed 'supervisor' (not necessarily [ ] Renner) did not allow her to work," and that the complaint "cannot be rewritten to state that the cause of the work non-assignment was retaliation by [ ] Renner," Defs.' Reply at 11.  Construing, as it must, all reasonable inferences in the light most favorable to the plaintiffs, the Court finds that the unnamed supervisor could have been Renner.

[23] The defendants also argue that "the [Amended] Complaint's factual allegations do not present any 'plausible' basis for the conclusory speculation that [ ] Jones knew" of Jane Doe 1's initial report to Renner, Defs.' 2d Mem. at 26, and that consequently, "as a matter of law[,] he could not have retaliated for Jane Doe 1's protected action when he was unaware of it," id.  However, the defendants are mistaken in arguing that "Jones could not have retaliated for Jane Doe 1's protected action when he was unaware of it," id., because the plaintiffs maintain that "after Jane Doe 1 complained to Renner, Renner [and not Jones] retaliated against Jane Doe 1 by telling 'her that she was not allowed to work the event that evening," Pls.' Opp'n at 18 (emphasis added).  Therefore, this component of the defendants' argument in misguided.

have failed to plead sufficient facts from which a reasonable fact finder could "draw [a] reasonable inference that the defendant[s] [are] liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

In sum, the Court concludes that the plaintiffs have not pleaded sufficient facts to state a claim for retaliation under the D.C. Human Rights Act with respect to Jane Does 2, 3, 4, and 5 based on the allegation that the defendants reduced their hours, but that a reasonably jury could find that the defendants' refusal to allow Jane Doe 1 to work the evening event constituted a materially adverse action taken in retaliation for her protected activity. Therefore, the motion to dismiss is granted with respect to the retaliation claims of Jane Does 2, 3, 4, and 5 that the defendants retaliated against them by reducing their hours, but is denied as to Jane Doe 1.

**d.      Creation of a Hostile Work Environment**

This Circuit has recognized that a hostile work environment can amount to a materially adverse action and therefore can satisfy the second element of a retaliation claim. See Baird v. Gotbaum, 662 F.3d 1246, 1250 (D.C. Cir. 2011); Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006). To prevail on a retaliation claim based on a hostile work environment, a plaintiff must show that the defendant subjected the plaintiff to "discriminatory intimidation, ridicule, and insult" of such "sever[ity] and pervasive[ness] [as] to alter the condition of [a person's] employment and create an abusive working environment." Harris, 510 U.S. at 21 (citation omitted). A plaintiff may rely on discrete acts that "may not be actionable on [their] own" but become actionable due to their "cumulative effect" to establish the existence of a hostile work environment. See Morgan, 536 U.S. at 122. However, the constituent acts must be adequately linked and collectively meet the required hostile work environment standard (i.e., they must be sufficiently severe or pervasive). See Baird, 662 F.3d at 1251.

The plaintiffs allege that the "harassing, reckless, wrongful, willful and malicious treatment . . . by the [d]efendants solely because [they] made complaints of sexual harassment and objected to discriminatory conduct . . . is retaliation with the meaning of the D.C. Human Rights Act."[24]  Am. Compl. ¶ 124.  They further assert that "GW took no remedial measures in response to [the p]laintiffs' complaints," id. ¶ 126, and that "[i]nstead[,] the hostile environment continued," id.  The defendants, in response, argue that the plaintiffs have failed to allege that they were subjected to increased hostility after they complained about Jones's behavior to Renner.  See Defs.' 2d Mem. at 24–25, 27, 28.  They also argue that, with respect to Jane Does 1, 2, and 3, the plaintiffs have failed to show that Jones had knowledge of the plaintiffs' protected activity in order to establish a causal connection for a retaliation claim.  See id. at 24–25, 28; see also Defs.' Reply at 11–12.  The Court disagrees with the defendants and finds that the plaintiffs have pleaded sufficient factual allegations for a reasonable jury to infer that the plaintiffs were subjected to a hostile work environment in retaliation for complaining about Jones's alleged inappropriate behavior.

As an initial matter, the Court must first address the defendants' argument that the plaintiffs, with respect to Jane Does 1, 2, and 3, have failed to show that Jones had knowledge of their protected activity in order to establish a causal connection for a retaliation claim.  See id. at 24–25, 28; see also Defs.' Reply at 11–12.  Because, at the motion to dismiss stage, the hurdle of alleging a causal link is not a high one, see Jones v. Bernanke, 685 F. Supp. 2d 31, 40 (D.D.C.

---

[24] The case law of this Circuit is unclear as to whether a plaintiff is required to plead a claim of retaliatory hostile work environment separate and apart from a hostile work environment claim or retaliation claim.  Compare Brooks, 748 F.3d at 1278–79 (refusing to consider the merits of the plaintiff's "discrete-acts retaliation claim" because the plaintiff "neglected to allege [such] claim in her complaint" and "conflated the purported discrete retaliation claim with a retaliatory hostile work environment claim—two distinct theories of relief"), with Hussain, 435 F.3d at 366 (evaluating whether the plaintiff's allegations sufficed to show that he was subjected to a hostile work environment that amounted to retaliation although the complaint did not separately allege such a claim).  Nevertheless, the Court, construing all inferences in favor of the plaintiffs, as it is required to do, will consider the plaintiffs' retaliation claim based on the creation of a hostile work environment.

2010), the Court finds that all of the plaintiffs have satisfied their burden by alleging that they were subjected to "harassing, reckless, wrongful, willful and malicious treatment . . . by the [d]efendants solely because [they] made complaints of sexual harassment and objected to discriminatory conduct." Am. Compl. ¶ 124 (emphasis added); see also Rochon v. Gonzales, 438 F.3d 1211, 1220 (D.C. Cir. 2006) (observing that "in order to survive a motion to dismiss, 'all [the] complaint has to say' is 'the Government retaliated against me because I engaged in protected activity'") (quoting Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114 (D.C. Cir. 2000)); accord Beckham v. Nat'l R.R. Passenger Corp., 590 F. Supp. 2d 82, 89 (D.D.C. 2008) (denying the defendant's motion to dismiss a retaliation claim because the plaintiff "satisfied her burden by alleging that she was denied benefits because of her opposition to actions made unlawful by Title VII"); Vance v. Chao, 496 F. Supp. 2d 182, 187 (D.D.C. 2007) (denying the defendant's motion to dismiss because "[a]t this early stage of the proceedings, [the] plaintiff can meet her prima facie burden simply by alleging that the adverse actions were caused by her protected activity"). As to each Jane Doe, the Court will only consider the alleged adverse actions taken after the respective date when she first complained about Jones's behavior since "no materially adverse actions taken before that date could have been because of having engaged in protected activity." Whorton v. Washington Metro. Area Transit Auth., 924 F. Supp. 2d 334, 351 (D.D.C. 2013) (emphasis in original).

The Court next addresses the defendants' argument that "[c]ourts have [ ] only treated a hostile environment as retaliatory if its intensity or character changes after protected activity." Defs.' Reply at 10. The defendants rely on a number of cases to suggest that in order to establish a retaliation claim based on a hostile work environment, the plaintiffs must allege "that the work environment became 'more hostile' toward the plaintiff[s] after [their] complaints," Defs.' 2d

Mem. at 25 (citing <u>Peters v. District of Columbia</u>, 873 F. Supp. 2d 158, 202 (D.D.C. 2012)); <u>see</u> <u>also</u> Defs.' Reply at 10 (citing <u>Hussain</u>, 435 F.3d at 366; <u>Jones v. District of Columbia</u>, 314 F. Supp. 3d 36, 68 (D.D.C. 2018); <u>Hammel v. Marsh USA Inc.</u>, 206 F. Supp. 3d 219, 239 (D.D.C. 2016)), and that "[i]f it were otherwise, a claim for retaliation would lack the required 'causal connection' and 'motivational link' between the protected activity and the materially adverse action that 'is the very essence of a retaliation claim,'" <u>id.</u> However, these cases cannot be read to suggest that a retaliation claim based on a hostile work environment requires a showing that the work environment became more hostile as a result of an employee's protected activity. In addition, contrary to the defendants' argument, a claim for retaliation would not lack the required causal connection so long as the plaintiffs can prove that the "protected activity was the but-for cause of the alleged adverse action." <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 362 (2013). Therefore, the Court concludes that the plaintiffs need not show that they were subjected to increased hostility, as the defendants suggest, but rather must show only that the discrete "acts giving rise to a hostile work environment claim [ ] collectively meet the independent requirements of that claim (i.e., be 'sufficiently severe or pervasive,' and [ ] [are] adequately connected to each other (i.e., 'all acts which constitute the claim are part of the same unlawful employment practice,' as opposed to being an array of unrelated discriminatory or retaliatory acts." <u>Baird</u>, 662 F.3d at 1252 (citations omitted). And at the motion to dismiss stage in this case, the Court finds that the plaintiffs have met their burden and shall address in turn the allegations supporting each Jane Doe's claim of retaliation based on a hostile work environment.

The plaintiffs allege a number of instances from which the Court can reasonably infer that the plaintiffs were subjected to a hostile work environment after their complaints were lodged. As to Jane Doe 1, the Amended Complaint alleges that "[f]ollowing [Jane Doe 1's]

initial complaint to Renner, Jones deliberately and intentionally increased his hostility towards her." Am. Compl. ¶ 66.  More specifically, the plaintiffs claim that Jones "treat[ed] Jane Doe 1 with hostility and harass[ed] her as she quietly did her work," id., and "disparage[d] Jane Doe 1 to her supervisor," id.  Because the plaintiffs have "alleged some conduct in support of [Jane Doe 1's] claim," Holmes–Martin v. Leavitt, 569 F. Supp. 2d 184, 193 (D.D.C. 2008), and because the plaintiffs do not claim to have exhaustively alleged all of the instances of Jones's hostility toward Jane Doe 1, see Am. Compl. ¶ 66 (using the phrase "[f]or instance," which signals an example), the Court finds that the plaintiffs have sufficiently pleaded facts that support Jane Doe 1's retaliation claim based on a hostile work environment at the motion to dismiss stage.

The plaintiffs also sufficiently allege a retaliation claim based on a hostile work environment that is plausible on its face with respect to Jane Does 2, 4, and 5.  The plaintiffs allege that Jones had a "sexual rating system of the women he raped," Am. Compl. ¶ 32, "publicly announced to the IIEP staff members his sexual rating of the female coworkers from best to worse," id., and "described one of the women he raped as 'a dead fish because she was so drunk,'" id.  In addition, the plaintiffs allege that Jones "would frequently brag in the workplace about his sexual exploitation of the women in the workplace," id. ¶ 34, that he "bragged about the number of partners (e.g. victims) he had," id., and that he "would publicly torment and degrade his victims," id.  Specifically, with respect to Jane Doe 2, the plaintiffs allege that "Jones told Jane Doe 2's faculty supervisors and her coworkers" that the two had sex.  Id. ¶ 33.  As to Jane Doe 4 in particular, the plaintiffs allege that "after raping Jane Doe 4, Jones bragged in the workplace about his encounter to Jane Doe 4's coworkers," id. ¶ 44, that he "made humiliating, derogatory sexual comments about Jane Doe 4 to her coworkers and the faculty members working in the IIEP," id., and that he "publicly ranked Jane Doe 4 among the other females in

the office that he had victimized," id.   Lastly, specifically concerning Jane Doe 5, the Amended

Complaint alleges that "since Jane Doe 5 complained to Renner about Jones'[s] assault and

harassing conduct, Renner has viewed Jane Doe 5 in a sexualized manner[,] which impacted her

ability to perform her job."  Id. ¶ 92.  Concededly, these factual allegations regarding the

existence of a retaliatory hostile work environment lack specificity as to when certain events

occurred, and critically, whether certain events occurred after Jane Does 2, 4, and 5 complained.

Nevertheless, the Court is required to construe the facts in the light most favorable to the

plaintiffs and grant all reasonable inferences arising from those facts.  See Hettinga, 677 F.3d at

476.  The Court, accordingly, infers that these incidents occurred after Jane Does 2, 4, and 5

lodged their respective complaints.  Thus, the Court finds that, when considered in the aggregate,

these allegations are sufficiently "severe" and "pervasive" to move beyond "the ordinary

tribulations of the workplace," see Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998),

and concludes that the plaintiffs have sufficiently alleged facts that could be probative of the

existence of a retaliatory hostile work environment with respect to Jane Does 2, 4, and 5.

　　　Lastly, the plaintiffs allege facts that allow the Court to infer that Jane Doe 3 suffered a

hostile work environment after she complained to Renner.[25]  The plaintiffs claim that "Jane Doe

---

[25] The plaintiffs also argue that "[b]y leaving Jane Doe 3 completely helpless to respond to her female coworkers'
complaints of sexual assault and harassment, [the defendants] violated the statutory retaliation provision of the [D.C.
Human Rights Act]," Pls.' Opp'n at 23, and that "[b]y ignoring Jane Doe's complaints of discrimination filed on
behalf of her female subordinates, [the d]efendants 'coerced' Jane Doe 3 into allowing the hostile work environment
to continue to exist for her subordinates, when she had a duty as a supervisor to address those complaints," id. at 24.
They also opine that "[b]y ignoring, and/or covering up, Jane Doe 3's complaints of a hostile work environment
filed on behalf of her coworkers, [the d]efendants 'required' Jane Doe 3 to 'interfere' and 'intimidate' those
coworkers that had complained of discrimination."  Id. at 23–24.  However, as noted earlier, Federal Rule of Civil
Procedure 8(a)(2) requires the plaintiffs to plead "a short and plain statement of the claim showing that the pleader is
entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it
rests."  Twombly, 550 U.S. at 555.  The plaintiffs, however, fail to allege facts in their Amended Complaint that
would have put the defendants on notice that they intended to pursue claims under D.C. Code § 2-1402.61(b).
Therefore, because the plaintiffs cannot "present[] new factual allegations in [their] opposition to the defendant[s']
motion to dismiss," Reeves v. Fed. Bureau of Prisons, 885 F. Supp. 2d 384, 388 n.4 (D.D.C. 2012), the Court cannot
consider the facts now offered in support of these arguments, see Kingman Park Civic Ass'n v. Gray, 27 F. Supp. 3d

(continued . . .)

3 has begun to fear for her safety since she has been an advocate for the other female workers," id. ¶ 81, which resulted in Jane Doe 3 "avoiding the office as much as possible and cutting back significantly on her hours," id., which adversely affected Jane Doe 3 "as she was unable to interact with her team directly or her faculty supervisor" and to "perform[] her job duties, thereby impacting the terms and conditions of her employment," Pls.' Opp'n at 24 (citing Am. Compl. ¶ 82). The plaintiffs also contend that "because Jane Doe 3 had to protect her co-workers from Jones, she was forced to take their shifts at events and spend more time with Jones; a man she found anxiety-inducing." Am. Compl. ¶ 82. All of these allegations, when considered collectively, suggest that Jane Doe 3 was subjected to a hostile work environment after she complained about Jones's behavior to Renner.

In sum, the Court finds that the plaintiffs have sufficiently pleaded facts that support their position that they were subjected to a hostile work environment in retaliation for reporting Jones's behavior to Renner. Accordingly, the Court denies the defendants' motion to dismiss the plaintiffs' retaliation claim based on a hostile work environment.

### e.    Constructive Discharge

The plaintiffs also allege that the defendants retaliated against them by "terminating them from their employment with GW." Am. Compl. ¶ 123. Because the Court agrees with the defendants that the plaintiffs do not allege that Jane Does 3, 4, and 5 were terminated, see Defs.' 2d Mem. at 23, 28; see also Am. Compl. ¶¶ 35, 69 (alleging that only Jane Does 1 and 2 were constructively discharged), it grants the defendants' motion to dismiss the retaliation claims of Jane Does 3, 4, and 5 based on the allegation that they were terminated in retaliation for

---

(. . . continued)
171, 179 (D.D.C. 2014), aff'd on other grounds sub nom. Kingman Park Civic Ass'n v. Bowser, 815 F.3d 36 (D.C. Cir. 2016).

complaining and addresses only the defendants' arguments with respect to Jane Does 1 and 2. The defendants argue that the allegation that Jane Doe 1 was constructively discharged on April 2, 2018, "does not support a retaliation claim because the alleged constructive discharge was not supported by well pled allegations." Defs.' 2d Mem. at 26 (internal quotation marks omitted). They also argue that Jane Doe 2 has "not shown that she had no option but to end her employment, and was not constructively terminated as a matter of law." Id. at 27–28 (internal quotation marks and citation omitted). The defendants contend that "'something more' than . . . a hostile work environment" is required to support a constructive discharge claim. Defs.' Reply at 10 (quoting Walden v. Patient-Centered Outcomes Research Inst., 177 F. Supp. 3d 336, 346 (D.D.C. 2016)).

To establish a retaliation claim based on constructive discharge, "a plaintiff must show that []she was retaliated against because of []her [protected] activity and that retaliation constituted intolerable working conditions in which a reasonable person in similar circumstances would have felt compelled to resign." Downey v. Isaac, 622 F. Supp. 1125, 1133 (D.D.C. 1985), aff'd, 794 F.2d 753 (D.C. Cir. 1986). "The mere existence of workplace discrimination is insufficient to make out a constructive discharge claim." Veitch v. England, 471 F.3d 124, 130 (D.C. Cir. 2006). Rather, a plaintiff must prove that "aggravating factors," beyond just discrimination, forced her to leave her employment. Dashnaw v. Pena, 12 F.3d 1112, 1115 (D.C. Cir. 1994).

Here, the plaintiffs have pleaded sufficient facts that support that Jane Does 1 and 2 were constructively discharged in retaliation for complaining about Jones's behavior. The plaintiffs allege that Jane Doe 1 was "forced to resign out of her fear of interacting with Jones," Am. Compl. ¶ 69, and that Jane Doe 2, in her resignation letter to Renner, wrote that "[w]orking in the

recent months at [the] IIEP has been a terrible experience," that the IIEP's "inability or

unwillingness to protect [her] . . . from a clear and imminent threat has been disheartening," and

that "after putting forth so many months of fighting for my safety and seeing little to nothing

happening, I am no longer willing to work under the [IIEP]." Id. ¶ 109. At this stage in the

litigation, these facts, taken in conjunction with the Court's conclusion in Part III.A.2.d. of this

Memorandum Opinion, supra, that Jane Does 1 and 2 were subjected to hostility in their work

environment as a result of their respective complaints to Renner, support the inference that this

hostility "constituted intolerable working conditions in which a reasonable person in similar

circumstances would have felt compelled to resign." Downey, 622 F. Supp. at 1133. Therefore,

the Court denies the defendants' motion to dismiss the retaliation claims of Jane Does 1 and 2

that they were constructively discharged in retaliation for lodging their complaints.

### 3. Count III – Gender Discrimination in Violation of the D.C. Human Rights Act

The plaintiffs claim that the defendants discriminated against them because of their

gender. See Am. Compl. ¶ 133. The defendants argue that "[the p]laintiffs' claim of [ ] gender

discrimination is based almost entirely on the same allegations of a hostile work environment

that form the basis of the [D.C. Human Rights Act] hostile-environment claim in Count I."

Defs.' 2d Mem. at 29. According to the defendants, "duplicative claims of a hostile work

environment are unnecessary." Id. (internal citations omitted). The defendants also argue that

the remaining allegations that "are not based on hostile-environment allegations" fail to state a

claim.[26] Id. at 30. The Court will address each of the defendants' argument in turn.

---

[26] The Amended Complaint also alleges that the defendants discriminated against the plaintiffs on the basis of their gender by

> subjecting them to a hostile work environment . . . ; subjecting them to sexually suggestive remarks, and sexually suggestive touching . . . ; subjecting them to a workplace environment where they were forced to silently endure sexual advances and sexual advancement to maintain

(continued . . .)

As to the defendants' first argument, the Court disagrees with the defendants and finds that the plaintiffs' gender discrimination claims are not duplicative of their hostile work environment claims. "A court may dismiss duplicative claims in its discretion." WMI Liquidating Trust v. FDIC, 110 F. Supp. 3d 44, 59 (D.D.C. 2015) (Walton, J.). "Claims are duplicative when they stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." Id. (internal quotation marks omitted). The standards for establishing discrimination and hostile work environment claims are not identical. As stated earlier, to state a hostile work environment claim under the D.C. Human Rights Act, a plaintiff must show:

> (1) that [s]he is a member of a protected class, (2) that [s]he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment.

Campbell-Crane, 44 A.3d at 933. By contrast, to state a claim for gender discrimination under the D.C. Human Rights Act, a plaintiff must allege that

> (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination, that is, an unfair inference that her employer took the action because of her membership in a protected class.

---

(. . . continued)
their positions; subjecting them to a workplace environment where regular and pervasive comments were made demeaning women in general; subjecting them to a workplace environment with regular and persistent unwelcome sexual advances, requests for sexual favors, verbal and physical harassment . . . ; failing to take Plaintiffs' complaints of sexual harassment and hostile work environment seriously . . . ; creating a workplace where women are subordinate to men and subject to physical touching, demeaning, and insulting comments."

Am. Compl. ¶ 133. However, the defendants have not moved to dismiss these gender discrimination claims. Therefore, the Court will only address the defendants' arguments with respect to the allegations that the defendants discriminated against the plaintiffs on the basis of their gender by "subjecting them to different terms and conditions of their employment – specifically advising them to work from home – because of their gender; [and] providing due process rights to men (specifically to Jones) greater than those afforded to Plaintiffs because of their gender; and implementing and executing Title IX investigations and procedures differently for female students because of their gender." Id.

Miles v. Univ. of the D.C., Civ. Action No. 12-378, 2013 WL 5817657, at *13 (D.D.C. Oct. 30, 2013) (Walton, J.) (citations omitted).  Although claims for a hostile work environment and for gender discrimination contain some similar elements, they are not "decided under identical legal standards."  WMI Liquidating Trust, 110 F. Supp. 3d at 59; see also Lester v. Natsios, 290 F. Supp. 2d 11, 33 (D.D.C. 2003) ("Discrete acts constituting discrimination or retaliation claims, therefore, are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult.").  Here, the plaintiffs' gender discrimination and hostile work environment claims cannot be "decided under identical legal standards," WMI Liquidating Trust, 110 F. Supp. 3d at 59, and therefore, the Court will deny the defendants' motion to dismiss Count III of the Amended Complaint as duplicative of Count I.

The defendants also argue that the plaintiffs' remaining allegations that "are not based on hostile environmental allegations . . . are insufficient to state a claim."  Defs.' 2d Mem. at 30.  Specifically, they contend that although the Amended Complaint alleges that the defendants "provided 'due process rights to men (specifically to Jones) greater than those afforded to [the p]laintiffs because of their gender; and implemenet[ed] and execut[ed] Title IX investigations and procedures differently for female students because of their gender,'" id. (citing Am. Compl. ¶ 133), "there are no allegations anywhere in the [Amended] Complaint to support these patently conclusory claims, and no allegations that female students engaged in sexual harassment that created a hostile work environment for men," id., and therefore, "[t]hese threadbare contentions fail to state a claim," id. (internal quotation marks and citation omitted).  The Court agrees that these conclusory statements are insufficient to allow the Court to "draw [a] reasonable inference that the defendant[s] [are] liable" for gender discrimination.  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  Although the plaintiffs argue that the Amended Complaint alleges

that "men in the IIEP office were treated more favorably as a result of their gender," Pls.' Opp'n at 27, and that "the rights of men (Jones'[s] due process rights and Tile IX rights) were placed above the rights of women," id. at 28, the plaintiffs not only fail to identify in the Amended Complaint any due process rights that are implicated but also fail to explain the Title IX investigations and procedures that the defendants allegedly implemented and executed differently for female students. Without alleging such facts, the Court must grant the defendants' motion to dismiss as to these allegations because the Amended Complaint, as currently drafted, does not "give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555.

The defendants also contend that the allegation that the plaintiffs "were subjected to 'different terms and conditions of their employment' when they were advised to 'work from home' pending termination procedures" also fails to state a claim[27] because "without a change in duties or compensation, an order that an employee work from home is not an adverse employment action," Defs.' 2d Mem. at 30 (internal quotation marks and citation omitted), and therefore, "there can be no gender-discrimination claim," id. at 31 (citation omitted). Because the Court has already concluded that requesting that the plaintiffs work from home is not alone a materially adverse action sufficient to sustain the plaintiffs' retaliation claim, see Part III.A.2.a., supra, and because "[t]he concept of 'adverse action' in the retaliation context is broader than in the discrimination context and can encompass harms unrelated to employment or the

---

[27] The defendants also argue that this allegation also fails to state a claim because the allegation that the plaintiffs were "offered the option to work from home after registering concerns for their safety does not create an inference that [the d]efendants "took the action because of" [the p]laintiffs' gender," Defs.' 2d Mem. at 30 (citation omitted), but "[r]ather, it only shows that an accommodation was offered to persons who expressed concerns for their safety, and there is no allegation that anyone who expressed concerns for their safety—male or female—was not offered the same option," id. (citation omitted). However, because the Court finds that the request to work from home is not an adverse action, the Court need not address whether a causal connection between the protected activity and the alleged material adverse action can be established.

workplace," <u>Franklin</u>, 600 F. Supp. 2d at 66, the Court finds that requesting that the plaintiffs work from home is not alone an adverse action sufficient to sustain the plaintiffs' discrimination claim. Therefore, the Court also grants the defendants' motion to dismiss this component of the plaintiffs' gender discrimination claim, to the extent that the plaintiffs seek to rely on the allegations that the defendants provided "due process rights to men (specifically to Jones) greater than those afforded to [the p]laintiffs because of their gender; and implemenet[ed] and execut[ed] Title IX investigations and procedures differently for female students because of their gender,'" Am. Compl. ¶ 133, and that the plaintiffs were subjected to different terms and conditions of their employment when they were asked to work from home, <u>id.</u>

### 4. Count IV – Aiding and Abetting in Violation of the D.C. Human Rights Act

The defendants argue that the plaintiffs' aiding and abetting claim should be dismissed because "it is entirely duplicative of Counts I ([]hostile environment) and II ([]retaliation)[.]" Defs.' 2d Mem. at 31. The Court disagrees.

As noted earlier, "[a] court may dismiss duplicative claims in its discretion." <u>WMI Liquidating Trust</u>, 110 F. Supp. 3d at 59. And again, "[c]laims are duplicative when they 'stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available.'" <u>Id.</u>

In Count I, the plaintiffs claim that "GW and Renner fostered, accepted, ratified, and/or otherwise failed to prevent or to remedy a hostile work environment that included, among other things, severe and pervasive harassment of [the p]laintiffs because of their gender." Am. Compl. ¶ 117. Count II alleges that "[the d]efendants retaliated against [the p]laintiffs by forcing them to work from home, disciplining them, reducing their hours, and terminating them from their employment with GW." <u>Id.</u> ¶ 123. Count II further alleges that "GW took no remedial measures in response to [the p]laintiffs' complaints. Instead[,] the hostile environment continued and grew

worse as more unsuspecting women were preyed upon by Jones." Id. ¶ 126. In Count IV, the

plaintiffs contend that because "Renner and GW knew or should have known about Jones['s] and

Renner's discriminatory and retaliatory conduct in violation of the [D.C. Human Rights Act] and

failed to stop it," Am. Compl. ¶ 139, they "unlawfully aided and abetted the discriminatory and

retaliatory conduct" in violation of D.C. Code § 2-1402.62, id. ¶140. The Court finds that the

different legal theories advanced in Counts I and II and Count IV do not constitute "identical

allegations," and therefore, it will deny the defendants' motion to dismiss Count IV as

duplicative of Counts I and II. See DTCC Data Repository (U.S.) LLC v. U.S. Commodity

Futures Trading Comm'n, 25 F. Supp. 3d 9, 19 (D.D.C. 2014).

The defendants also argue that "if the claims of Jane Does 1 and 3 in Count I are

dismissed and all [of the p]laintiffs' claims in Count II are dismissed, the corresponding 'aiding

and abetting' claims should also be dismissed," Defs.' 2d Mem. at 32, because "an individual

cannot be liable under the aiding and abetting provision absent an underlying direct violation of

the [D.C. Human Rights Act]," id. (citing Richardson v. Petasis, 160 F. Supp. 3d 88, 138 (D.D.C.

2015)). Because the Court does not agree entirely with the defendants "that [the p]laintiffs'

[D.C. Human Rights Act] claims in Counts I and II[] should be dismissed for failure to state a

claim," id., and is not granting the defendants' motion to dismiss the hostile work environment

claims and the retaliation claims in its entirety, the Court denies the defendants' motion to

dismiss as to this theory of liability as well.

### 5. Count V – Negligent Training, Supervision, and Retention

The plaintiffs allege that GW negligently breached its duty to train and supervise its

employees. Am. Compl. ¶ 145. Because of these failings, the plaintiffs allege that "[i]t was

foreseeable to [ ] GW that the failure to train its employees, including Renner and Jones, would

result in [ ] sexual harassment in the IIEP office and [would] cause harm to its employees[.]" Id.

¶ 146.  The defendants counter that the plaintiffs' claims regarding negligent training and supervision should be dismissed because "the tort of negligent supervision applies only to common law causes of action."  Defs.' 2d Mem. at 32.

The District of Columbia Court of Appeals held that "a common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law.  A claim that an employer negligently supervised an employee who has sexually harassed a co-employee does not transmute sexual harassment into a common law tort." Griffin v. Acacia Life Ins. Co., 925 A.2d 564, 576–77 (D.C. 2007) (holding that a "negligent supervision claim cannot be predicated on the [D.C. Human Rights Act]) (citations omitted).  "This is not to say that a claim for negligent supervision cannot be based on a separate common law tort, which might also be grounds for a statutory claim under the [D.C. Human Rights Act]." Id. at 577.  For example, sexual harassment "may include misconduct by a co-employee that is independently actionable under the common law, such as battery or intentional infliction of emotional distress." Id.  "Thus[,] a negligent supervision claim could lie in a sexual harassment case if supported by a viable claim of independent tortious conduct as recognized at common law." Id.

The plaintiffs contend that their "negligent training and supervision claims are not predicated on the [D.C. Human Rights Act], but instead [on] the common law torts of battery, assault, and intentional infliction of emotional distress committed by . . . Jones." Pls.' Opp'n at 30.  However, like the employee in Griffin, the plaintiffs have failed to plead any common law causes of action.  See generally Am. Compl.  Accordingly, the plaintiffs did not predicate their

negligent training and supervision claim on a common law cause of action, the Court must

therefore grant the defendants' motion to dismiss Count V of the Amended Complaint.[28]

### 6. Count VI – GW's Indifference to Sexual Harassment in Violation of Title IX

The plaintiffs claim that "GW created and/or subjected [the p]laintiffs to a hostile

educational environment in violation of Title IX." Am. Compl. ¶ 150. They contend that the

"sex-based harassment endured by [the p]laintiffs was so severe, pervasive, and objectively

offensive [such] that it deprived [the p]laintiffs of access to educational opportunities or benefits

provided by GW." Id. ¶ 149. In response, the defendants argue that the plaintiffs fail to show

that Jane Does 1 and 3 "suffered from harassment 'so severe, pervasive, and objectively

offensive' to bar them from an educational opportunity," Defs.' 2d Mem. at 35, and that they do

"not claim 'deliberate indifference' to [ ] Renner's alleged harassment of Jane Does 1 and 3," id.

at 33.

Title IX prohibits sex discrimination by recipients of federal education funding. See

Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005). The statute provides that "[n]o

person in the United States shall, on the basis of sex, be excluded from participation in, be denied

the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance." 20 U.S.C. § 1681(a). As the Supreme Court observed,

"Title IX implies a private right of action to enforce its prohibition on intentional sex

discrimination. In subsequent cases, we have defined the contours of that right of action."

Jackson, 544 U.S. at 173. A university may be liable for damages under Title IX for

discrimination in the form of student-on-student harassment if the plaintiff shows that (1) the

---

[28] Because Count V is dismissed, the Court will not address the defendants' additional argument that the plaintiffs
failed to show that GW knew or should have known of Jones' assaults prior to a report being made. Defs.' 2d Mem.
at 33.

university had "actual knowledge" of the sexual harassment or discrimination; (2) the university "exercise[d] substantial control over both the sexual harasser and the context in which the known harassment occur[red]"; (3) the sexual harassment complained of was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school"; and (4) the university was "deliberately indifferent to [the known acts of] sexual harassment."  Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 643–51 (1999).  "[A] damages remedy will not lie [against a university] under Title IX," however, unless a plaintiff can demonstrate that "an official who at minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [university]'s behalf ha[d] actual knowledge of the discrimination in the [university]'s programs and fail[ed] adequately to respond."  Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).  "The university's response—or failure to respond—moreover, 'must amount to deliberate indifference to discrimination.'"  Cavalier, 306 F. Supp. 3d at 25–26 (quoting Gebser, 524 U.S. at 290).

For the same reasons that the Court already concluded that Jane Does 1 and 3 were subjected to severe or pervasive harassment for the purposes of their hostile work environment claim,[29] see Part III.A.1., supra, the Court finds that the plaintiffs have plausibly pleaded allegations from which the Court can infer that Jane Does 1 and 3 were subjected to conduct "so

---

[29] The Title IX standard for a hostile educational environment has been held by a former member of this Court as equivalent to the Title VII standard for a hostile work environment, see Pinkney v. Robinson, 913 F. Supp. 25, 32 (D.D.C. 1996) (considering "Title VII principles to review the plaintiff's claim of Title IX liability" for a hostile work environment and finding that the "same rules should apply to determine liability"), which itself is analogous to the standard under the D.C. Human Rights Act, see e.g., Elhusseini, 578 F. Supp. 2d at 10 n.4.

severe, pervasive, and objectively offensive" that would bar them from educational opportunities.[30] Davis, 526 U.S. at 651.

As further grounds for challenging the sustainability of the plaintiffs' Title IX claims, the defendants also argue that the plaintiffs do "not allege that [GW] was deliberately indifferent to the alleged harassment of Jane Does 1 and 3 by [ ] Renner." Defs.' 2d Mem. at 36. They contend that "[e]ven if such a claim had been made, it would be deficient because there is no allegation that any [GW] manager above [ ] Renner, with authority to take corrective measures, had actual knowledge of his alleged conduct, as required." Id. (internal quotation marks and citations omitted). The plaintiffs respond that the Amended Complaint "contains 21 paragraphs of allegations of GW's deliberate indifference to the complaints of sexual harassment and sexual assault by Jones." Pls.' Opp'n at 32 (citing Am. Compl. ¶¶ 93–114). However, contrary to the plaintiffs' belief, the defendants are contesting the plaintiffs' allegations—or lack thereof—regarding GW's knowledge of Renner's harassing conduct, not Jones's. The defendants are correct that "Count VI is based entirely on the alleged conduct of [ ] Jones, and not on any alleged harassment by [ ] Renner." Defs.' 2d Mem. at 35. The Amended Complaint states that "GW and its officials had actual knowledge of sexual assaults and harassment committed by Jones, and the resulting harassment of [the p]laintiffs created by GW's failure to investigate and discipline Jones in a timely manner." Am. Compl. ¶ 151 (emphasis added). The plaintiffs fail to allege that GW had any knowledge about Renner's alleged inappropriate conduct toward Jane Does 1 and 2. See e.g., Am. Compl. ¶¶ 61, 73. Therefore, the Court will grant the defendants'

---

[30] The Court notes that the plaintiffs have sufficiently pleaded that the alleged harassment affected their terms of employment, as well as their educational opportunities. See Am. Compl. ¶¶ 36, 45, 70, 82, 92.

motion to dismiss the plaintiffs' Title IX deliberate indifference claim as to Jane Does 1 and 3,

but only with respect to Renner's alleged conduct.[31]

### 7. Count VII – GW's Retaliation in Violation of Title IX

The defendants argue that the plaintiffs "allege in a vague and conclusory fashion that

they were all denied 'their rights under Title IX.'"[32] Defs.' 2d Mem. at 37 (quoting Am. Compl.

¶ 160) (footnote added).[33] They contend that the plaintiffs' Title IX retaliation should be

dismissed for three reasons: (1) "there are no specific allegations in the [Amended] Complaint to

show that the claimed 'rights' were denied to any of the [p]laintiffs," id. at 38; (2) "[t]here is

simply no factual allegation in the [Amended C]omplaint which suggests a causal connection

---

[31] In their reply to the plaintiffs' opposition, the defendants raise several arguments for the first time regarding whether GW had actual knowledge of any alleged harassment of Jane Doe 1 by Jones. See Defs.' Reply at 19. In their motion to dismiss itself, the defendants only argue that the plaintiffs do "not allege that [GW] was deliberately indifferent to the alleged harassment of Jane Does 1 and 3 by [ ] Renner," Defs.' 2d Mem. at 36 (emphasis added), and not Jones. Therefore, in accordance with the "well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief," Lewis v. District of Columbia, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011), the Court will "ignore those arguments in resolving the [defendants'] motion [to dismiss]." Baloch v. Norton, 517 F. Supp. 2d 345, 348 n.2 (D.D.C. 2007).

[32] The plaintiffs assert denial of the following fifteen "rights" ("Title IX rights"):

> (a) Respectful treatment throughout the process, regardless of outcome; (b) University counseling services; (c) Be informed about the student judicial process on an ongoing basis; (d) Access case file within legal parameters; (e) A no contact order with the other party throughout the process; (f) To have an advisor of your choosing present with you during any and all phases of the investigation and hearing; (g) A thorough, prompt, and equitable investigation and resolution of a complaint; (h) Opportunity to submit a written statement addressing the allegations and to provide evidence and witnesses; (i) Be informed of the university's code of conduct for students, faculty, and staff, including anticipated timelines and possible outcomes of a complaint; (j) Request protective measures, remedies, support, and resources; (k) Protection against retaliation from any university staff or student; (l) A free forensic exam from a Sexual Assault Nurse Examiner; (m) The option to notify law enforcement, independent of campus process; (n) Receive assistance modifying academic or housing situation; and, (o) Not to have to interact face-to-face with the respondent at any time during the process.

Am. Compl. ¶ 160.

[33] The defendants also argue that the plaintiffs "do not indicate a legal source of the claimed rights[,] Title IX does not list any of these rights in the statute, and no private cause of actions has been recognized for the enforcement of Title IX regulations or administrative guidances." Defs.' 2d Mem. at 38 (internal quotation marks omitted) (citing Gebser, 524 U.S. at 292). However, as indicated by the Supreme Court, "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." Jackson, 544 U.S. at 173 (emphasis added).

between the act of reporting the sexual harassment and the school's alleged failure to respond appropriately," id. at 39 (alterations in original) (citation omitted); and (3) "the alleged retaliation includes [the] same acts or omissions which [the p]laintiffs allege constituted 'deliberate indifference' to sexual harassment, with no attempt to show that [the] acts or omissions occurred because of [the p]laintiffs' complaints," id. The Court will address each in turn.

"Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." Jackson, 544 U.S. at 173. To state a claim for Title IX retaliation, a plaintiff must allege that the defendant is a recipient of federal funding and that the defendant retaliated against the plaintiff "because [s]he complain[ed] of sex discrimination." Id. at 174. "Beyond this, neither the Supreme Court nor [this] Circuit has outlined the precise contours of a Title IX retaliation claim." Cavalier, 306 F. Supp. 3d at 36. "Various decisions from this district and from other circuits, however, 'have generally held' that Title VII's retaliation standard governs," id., and this Court has no reason not to take the same position. Under that standard, a plaintiff must show that: "[(1)] she made a charge or opposed a practice made unlawful by Title IX, [(2)] that the university took a materially adverse action against her, and [(3)] that the university took the action because of her protected conduct." Id. Where there is no direct evidence of retaliation, a plaintiff must show "that there was a causal link" between the protected activity and adverse action. Id.

The defendants first argue that the plaintiffs' Title IX retaliation claim should be dismissed because "there are no specific allegations in the [Amended] Complaint to show that the claimed 'rights' were denied to any of the [p]laintiffs." Defs.' 2d Mem. at 38. To the extent that the plaintiffs allege that the defendants retaliated against them by denying the plaintiffs their

Title IX rights, the Court agrees that the allegations following the Count itself are deficient because the plaintiffs fail to sufficiently plead facts that would support their conclusion. However, because the plaintiffs "reallege and incorporate by reference the allegations contained in the proceeding paragraphs" of the Amended Complaint, Am. Compl. ¶ 159, the Court finds that they have preserved the "five adverse actions" alleged in support of their retaliation claims under the D.C. Human Rights Act, which are as follows:

> "(1) forc[ing] them to work from home; (2) subject[ing] them to an increasingly hostile work environment[, by] forcing them to work in close proximity to their assaulter or harasser; (3) reassign[ing] Jane Doe 1's job responsibilities; (4) ridicul[ing] them by stating Jane Doe 2 should go to therapy; and ([5]) threaten[ing] them by accusing them of "spreading misinformation" and "making the situation worse."

Pls.' Opp'n at 36.

The defendants, in their reply to the plaintiffs' opposition, argue that "[i]n the alternative, the Title IX retaliation claims described for the first time in the [o]pposition would be insufficient—had they actually been plead—for the same reasons as the [D.C. Human Rights Act] retaliation claims." Defs.' Reply at 21. They also argue that "[t]here is simply no factual allegation in the [Amended C]omplaint which suggests a causal connection between the act of reporting the sexual harassment and the school's alleged failure to respond appropriately,"[34] Defs.' 2d Mem. at 39 (alterations in original) (citation omitted). However, for the reasons already set forth in Part III.A.2. of this Memorandum Opinion, supra, the adverse actions that the plaintiffs have sufficiently pleaded to establish their retaliation claims under the D.C. Human Rights Act are also sufficient to support their Title IX retaliation claim.

---

[34] It is not entirely clear whether the defendants intend their second argument to contest the causal connection requirement; however, the Court construes it as such because, contrary to the defendants' argument, the plaintiffs need not show a causal connection between the act of reporting the sexual harassment "and the school's alleged failure to respond appropriately," Defs.' 2d Mem. at 39, but rather the specific alleged retaliatory acts, which in this case is not the "school's alleged failure to respond appropriately," as the defendants suggest, id.

With respect to the defendants' third argument that the plaintiffs' Title IX retaliation claim must be dismissed because "the alleged retaliation includes [the] same acts or omissions which [the p]laintiffs allege constituted 'deliberate indifference' to sexual harassment, with no attempt to show that [the] acts or omissions occurred because of [the p]laintiffs' complaints," Defs.' 2d Mem. at 39, the Court disagrees with the defendants. In support of their argument, the defendants suggest that the principles that applied in Cavalier apply here. See Defs.' Mem at 39–40. However, this case does not implicate the same facts that existed in Cavalier. In Cavalier, the defendant argued that the alleged retaliatory action were "not retaliatory at all; rather[,] they are the same conduct on which [the plaintiff] bases her Title IX-deliberate indifference claim." Cavalier, 306 F. Supp. 3d at 37. The district court in Cavalier held that to the extent the plaintiff "lumps all of her allegations together, without attempting to delineate which 'adverse actions' were taken in response to her complaints [ ] which alleged deficiencies in the University's response to the alleged assault, the Court agrees that her claims are either circular or too vague to satisfy [Federal] Rule [of Civil Procedure] 8." Id. Here, the plaintiffs sufficiently separate their allegations as to which adverse actions were taken in response to their complaints and the adverse actions upon which they base their Title IX-deliberate indifference claim, which do not overlap. Therefore, for the same reasons that the Court, in Part III.A.2. of this Memorandum Opinion, supra, granted in part and denied in part the defendants' motion to dismiss the plaintiffs' retaliation claims under the D.C. Human Rights Act, the Court denies the motion with respect to the claims of Jane Does 1, 2, and 3 that the defendants retaliated against them by disciplining them, with respect to Jane Doe 1's claim that the defendants retaliated against her by reducing her hours, with respect to all of the plaintiffs' claims that a hostile work environment can amount to retaliation, and with respect to the claims of Jane Does 1 and 2 that

the defendants retaliated against them by forcing them to resign. The defendants' motion to dismiss is granted in all other respects regarding the plaintiffs' Title IX retaliation claims.[35]

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that it must deny the defendants' motion to dismiss the original Complaint as moot in light of the plaintiffs' filing of the Amended Complaint. The Court also concludes that it must grant the plaintiffs' motion for leave to proceed under the pseudonyms Jane Does 1 to 5, but only during the pretrial components of the case. Moreover, the Court concludes that it must deny the defendants' motion to dismiss the Amended Complaint for lack of subject matter jurisdiction as moot in light of the Court's granting of the plaintiffs' motion for leave to proceed during all pretrial proceedings with the pseudonyms Jane Does 1 to 5.

In addition, the Court concludes that it must grant in part and deny in part the defendants' motion to dismiss for failure to state a claim. Specifically, as to the plaintiffs' claims in Counts II and VII, the Court concludes that it must grant the motion with respect to all plaintiffs' claims based on Renner's alleged relocation request, the claims of Jane Does 4 and 5 based on Renner's alleged disciplinary statements, the claims of Jane Does 2, 3, 4, and 5 based on Renner's alleged reduction of their hours, and the claims of Jane Does 3, 4, and 5 that the defendants retaliated against them by forcing them to resign. The Court also concludes that it must grant the defendants' motion to dismiss as to Count III with respect to the plaintiffs' gender discrimination claim based on the alleged denial of the plaintiffs' due process rights, unequal implementation of

---

[35] Specifically, the motion to dismiss is granted with respect to the plaintiffs' retaliation claim based on Renner's request that the plaintiffs work from home, with respect to the claims of Jane Does 4 and 5 that the defendants retaliated against them by disciplining them, with respect to the claims of Jane Does 2, 3, 4, and 5 that the defendants retaliated against them by reducing their hours, and with respect to the claims of Jane Does 3, 4, and 5 that the defendants retaliated against them by forcing them to resign. The motion is also granted to the extent that the plaintiffs allege that the defendants retaliated against them by denying them their Title IX rights.

Title IX, and Renner's suggestion that the plaintiffs work from their homes.  The Court also

concludes that it must grant the defendants' motion to dismiss Count V.  The Court further

concludes that it must grant the defendants' motion to dismiss the Title IX-deliberate

indifference claims of Jane Does 1 and 3 in Count VI based on Renner's alleged conduct.  The

Court further concludes that it must also grant the defendants' motion to dismiss the plaintiffs'

Title IX-retaliation claim in Count VII with respect to alleged retaliation in the form of denial of

their Title-IX rights.  Finally, the Court concludes that the defendants' motion to dismiss is

denied in all other respects.

Accordingly, the Court will grant in part and deny in part the defendants' motion to

dismiss.

**SO ORDERED** this 27th day of March, 2019.[36]

REGGIE B. WALTON
United States District Judge

---

[36] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.